# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## OCTOBER TERM, 1864.

### GEORGE F. HOOPER v. WELLS, FARGO & CO.

COMMON CARRIERS AND FORWARDERS.—The liabilities of common carriers and forwarders, independent of any express stipulation in the contract, are entirely different.

LIABILITY OF COMMON CARRIERS.—The common carrier who undertakes to carry goods for hire is an insurer of the property intrusted to him, and is legally responsible for acts against which he cannot provide, from whatever cause arising; the acts of God and the public enemy alone excepted.

LIABILITY OF FORWARDERS.—Forwarders are not insurers, but they are responsible for all injuries to property, while in their charge, resulting from negligence or misfeasance of themselves, their agents or employés.

RESTRICTIONS ON COMMON LAW LIABILITY OF COMMON CARRIER.—Restrictions upon the common law liability of a common carrier, for his benefit, inserted in a receipt drawn up by himself and signed by him alone, for goods intrusted to him for transportation, are to be construed most strongly against the common carrier.

RESTRICTING CLAUSE IN COMMON CARRIER'S RECEIPT.—If a common carrier, who undertakes to transport goods, for hire, from one place to another, "and deliver to address," inserts a clause in a receipt signed by him alone, and given to the person intrusting him with the goods, stating that the carrier is "not to be responsible except as forwarder," this restrictive clause does not exempt the carrier from liability for loss of the goods, occasioned by the carelessness or negligence of the employés on a steamboat owned and controlled by other parties

9

than the carrier, but ordinarily used by him, in his business of carrier, as a means of conveyance. The managers and employés of the steamboat are, in legal contemplation, for the purposes of the transportation of such goods, the managers and employés of the carrier.

CONSTRUCTION OF COMMON CARRIER'S RECEIPT.—A receipt signed by a common carrier for goods intrusted to him for transportation for hire, which restricts his liability, will not be construed as exempting him from liability for loss occasioned by negligence in the agencies he employs, unless the intention to thus exonerate him is expressed in the instrument in plain and unequivocal terms.

AMENDMENT OF COMPLAINT AFTER VERDICT.—Under our Practice Act a complaint cannot be amended in this Court so as to make it correspond with the verdict. The District Court, in a proper case, before judgment, may direct the complaint to be so amended.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The complaint did not ask judgment for or allege the damages at a sufficient amount to include interest on the value of the bullion.

The verdict of the jury included interest.

The other facts are stated in the opinion of the Court.

*Delos Lake*, and *A. Campbell*, for Appellants.

If the defendants are to be deemed common carriers, then, by the agreement under which the treasure was received in this case, their responsibilities and duties were limited to those of forwarders only.

The term "forwarder," or "forwarding merchant," has a well defined and ascertained meaning. A forwarder of merchandise, or forwarding merchant, is one whose business is to receive and send forward goods to their place of destination by the usual modes of public transportation. His character is that of a depositary for hire in storing, and that of an agent in forwarding the goods. (Edwards on Bail. 293 ; *Roberts* v. *Turner*, 12 John. 233.)

A forwarder of merchandise is discharged from liability on showing that he used ordinary diligence and prudence in sending on the property by responsible persons engaged in the carrying business. (Edwards on Bail. 294 ; Angell on Car.

§75, p. 81; Story on Bail. §444; 2 Kent, 591–2; *Platt* v. *Hibbard*, 7 Cow. 497; *Brown* v. *Dennison*, 2 Wend. 593; *Ackley* v. *Kellogg*, 8 Cow. 223; *Roberts* v. *Turner*, 12 John. 233.)

*Delos Lake*, and *John H. Saunders*, also for Appellants.

All the cases agree that a receipt, delivered and received under like circumstances, is a contract. (See *Parsons* v. *Montcath*, 13 Barb. 353; *Dorr* v. *N. J. Steam Nav. Co.* 1 Ker. 485; *Moore* v. *Evans*, 14 Barb. 524; *Wells* v. *The Steam Nav. Co.* 2 Comst. 204; Same case, 4 Selden, 375; *Holford* v. *Adams*, 2 Duer, 480.)

In each of these cases, the contract was a receipt or a "permit" signed only by the carrier; and in each case the document was held to be a valid and binding agreement. In the case of *Dorr* v. *New Jersey Steam Nav. Co.* (*supra*) the Court say: "The exception to the common law liability being made in the bill of lading and delivered to the agent of the plaintiff, must be deemed to have been agreed upon by the parties."

Did the contract, by its terms, discharge the defendants from all liability for loss caused or occasioned solely by the negligence of those in charge and having the management of the tug boat? The language of the contract is: "It is further agreed, and is part of the consideration of this contract, that Wells, Fargo & Co. are not to be responsible, *except as forwarders*, nor for any loss, or damages arising from the *dangers* of railroad, *ocean, or river navigation*, fire, etc." The respondent's counsel contend that the word "forwarders," as "used in the contract should be construed to mean, not technical forwarders, but such forwarders as expressmen are."

The contract, and every clause of it, must be presumed to have some meaning. Like all other agreements, it must be construed in the light of existing facts and circumstances at the time it was made. Interpreted by such existing facts and circumstances, then what did the parties mean by their contract? What are the facts?

The defendants are a company engaged in the regular business of an express company, in receiving, forwarding, carrying, and delivering, by sea or by land, treasure, goods, and packages, for hire, in care of their own messengers, in vessels, conveyances, steamers, boats, and vehicles, owned by others, and ordinarily used by the public at large as the common and public mode of transportation and conveyance. They have no interest in, or control over, these public vehicles, nor any voice in their management, nor control over the actions of those having their management. In case of negligence the most apparent, threatening disaster the most fearful, they are as powerless to prevent as any other stranger; and yet, in their character of common carriers, they are liable for all injuries to property which they have undertaken to transport, resulting from the negligence or unskilfulness of those who are employed in the navigation of steamers, boats, or vessels, or in the running of railroad cars or public stage coaches. This both parties well knew, and they also knew that accidents frequently occur, resulting from carelessness of engineers, and others engaged in navigating steamboats on ocean and river. In the light of all these facts, the defendants say, " We will take charge of your treasure, and will guard it on its passage, but inasmuch as we are compelled to use agencies, over which we have no control, we will only undertake to exercise proper care and prudence in the selection of the proper public vehicle, and we will not be responsible for the acts of the agents, nor accidents to the agencies, over which we not only have not, but are not permitted to have, any control." The words selected to express this meaning are apt and proper.

The term "*forwarder*" has a well defined and ascertained meaning. A forwarder of merchandise is one whose business it is to receive and send forward goods to their place of destination by the usual modes of public transportation. And he is discharged from liability on showing that he used ordinary diligence and prudence in sending on the property by responsible persons engaged in the carrying business.

The defendants agreed "to forward and deliver to address,"

and "not to be liable except as forwarders." Their agreement to forward did not oblige them to transport this bullion in their own vehicles, or in vehicles over which they exercised control. It was no breach of contract on their part to employ the ordinary public conveyances, such as the Ada Hancock.

Supposing the Ada Hancock, then, to have been, to all appearance, a safe and proper vehicle, the defendants were in the course of fulfilling their contract "to forward" when the explosion took place, and the bullion was lost through the fault of the engineer. They agreed "to forward," and they proceeded to do so.

If "to forward" in the contract is to be read "to carry," and "forwarders" to be changed into "carriers," the defendants must fail, for they admit that if their contract makes them common carriers, they are liable in this action.

If the contract of the defendants, properly interpreted, does not make them liable as carriers, there was nothing in the service they rendered in respect to this bullion to fix that character upon them. They dispatched it *en route* to the place of its destination on board a steam tug, a public vehicle, over which they had no control, and in which they had no interest, taking the additional precaution of sending a messenger to accompany it in its transit. This is the service of a forwarder, and not of a common carrier; and any one doing business simply and exclusively under the denomination of a forwarder would not have been liable under the circumstances of this case. (*Roberts* v. *Turner*, 12 Johnson, 232.)

Whatever is the true interpretation of this contract, it may be well to bear in mind that the loss of the bullion has in no respect affected its signification. What did its language fairly import at the time it was entered into, in view of the facts of this case? The statement sets forth that the defendants in transacting their business, employed vehicles owned by others, and used by the public at large. Of course this was known to the plaintiff, and he knew therefore that this bullion must necessarily be subjected in its transit to operations and agencies over which the defendants had no control. He knew

that the defendants had no more authority over the Ada Hancock or the steamer Senator than he had himself. When with these facts before him he delivers his bullion to the defendants, and they agree to " forward to San Francisco, and deliver to address," stipulating " not to be liable except as forwarders," the meaning of the contract seems too clear for dispute, unless we examine its terms under the influence of the preconceived idea that the defendants were carriers in spite of their contract, and could not be liable in any other capacity.

*H. & C. McAllister,* for Respondent.

Express companies are common carriers. This proposition is fully sustained by the following authorities: *Haslam* v. *Adams Express Co.,* 6 Bosworth, 241, 242, 244; *Place* v. *Union Express Company,* 2 Hilton, 19, 25, 26; *Russell* v. *Livingston,* 10 Barb. Sup. Ct. R. 346, 352–355; *Read* v. *Spaulding,* 5 Bosworth, 395, 404; *Mercantile Mutual Insurance Co.* v. *Chase,* 1 E. D. Smith, 115, 121–125; *Baldwin* v. *American Express Co.,* 23 Illinois, 198; *Stadhecker* v. *Combs,* 9 Richardson, 193, 199, 200; Redfield on Railways, 240, 241; *Adams & Co.* v. *Blankenstein,* 2 Cal. 413, 418; *Hayes* v. *Wells, Fargo & Co.,* 23 Cal. 185.

Whether common carriers use their own vessels or those of others in no way varies or modifies their responsibility. (*Wilcox* v. *Parmlee,* 3 Sandf. 610; *Fairchild* v. *Slocum,* 19 Wend. 332; *Place* v. *Union Express Co.,* 2 Hilton, 26; *Krender* v. *Wolcott,* 1 Hilton, 223; *Russell* v. *Livingston,* 19 Barb. 352.)

If the receipt of the defendants be considered a contract, binding upon plaintiff, and otherwise valid and operative, still, the exceptions and restrictions therein contained must be construed strictly and *fortius contra proferentem.*

It is a familiar maxim of the law that *verba chartarum fortius accipiuntur contra proferentum.*

They who choose the words, frame the language, draft the

instrument, and execute it, ought rather to be held to a strict interpretation of the paper than he who merely accepts it.

This rule of construction is especially applicable to deeds, poll, or other instruments of unilateral execution. When there is an indenture, the reason of the rule becomes less obvious; but even in such case, words' of exception or reservation are. regarded as the language of the party in whose favor the exception or reservation is made. If a deed may inure to several different purposes, he to whom it is made may elect in which way to take it. So, it has been held, that if an instrument may be either a bill, or a promissory note, the holder may elect which to consider it.

*Munn* v. *Baker*, 2 Starkie's N. P. C. 255 (3 Eng. Common Law, 339,) *Syllabus:* "A carrier who gives two notices, limiting his responsibility, is bound by that which is least beneficial to himself." (*Barney* v: *Prentiss*, 4 Har. & Johns. 317; *Beckman* v. *Shouse*, 5 Rawle, 179; *Eagle* v. *White*, 6 Whart. 505.)

The word "forwarders," as used in the receipt, should be construed to mean not technical forwarders, but such forwarders as expressmen are.

The counsel of defendants lay great stress upon that clause of the receipt which reads "*that Wells, Fargo & Co. are not to be held responsible except as forwarders;*" in fact, it is their sole reliance. They admitted, on the oral argument, that they could make no claim for exemption under those additional words, to wit: "*nor any loss or damage arising from the dangers of railroad, ocean, or river navigation, fire, etc.*"

The position of the defendants, as we understand it, is, that by using in the receipt the language, "*Wells, Fargo & Co. are not to be responsible, except as forwarders,*" they became forth-- with relieved from all the responsibilities of a common carrier, the entire nature of their vocation became changed, and their whole duty was reduced to shipping the packages and treasure intrusted to them by the ordinary channels of conveyance. That then their obligation ended, and their service was completed. No matter what the subsequent fate of the goods;

3

no matter how gross the negligence, how criminal the fraud by which they were lost in process of transportation, there was no liability on the part of the express company.

The gross injustice of any such construction is obvious. Its mere statement shocks the legal as well as the moral sense.

Express companies are not employed for any such pretended purpose. They are paid, not in order to commit to others for transportation the thing bailed to themselves, but that *they* may carry and deliver it. They receive a higher freight than ordinary bailees, because they profess to exercise a closer custody of, a more special supervision over the goods intrusted to them than does the ordinary carrier.

The packages bailed to them are generally of small bulk, but of great value; they remain during the entire transportation in the personal charge of the express messenger, and their delivery is made, not at the wharf or warehouse, as in the case of ordinary goods, but specially by the express employé at the office or residence of the consignee.

So far from merely forwarding the goods, merely delivering or shipping them by the usual channels of conveyance, their custody begins before that of the ordinary carrier, (for express packages are taken in charge, not at the stage or steamer, but at the express office,) is conducted throughout the journey more specially and carefully, and continues after the duties of the ordinary carrier have ceased.

In the present case, was the contract merely *to forward* the treasure? The receipt reads, "*Received of Geo. F. Hooper, dust and bullion package, value ten thousand seven hundred and fifty-five dollars, address, Geo. F. Hooper, which we agree to forward to San Francisco, and deliver to address.*"

The word "*forward*" is used in the sense of *transport,* and the whole contract in its language, in its effect, in its compensation, in all its elements, is utterly dissimilar to that of a *technical forwarder.* To particularize:

1. The defendants were to receive the whole of the consideration of carriage and delivery, to wit: eighty dollars and sixty-five cents.

2. Freight was charged by the defendants for the whole route.

3. The treasure was never delivered to the officers or employés of the steam tug.

4. The package remained in the exclusive custody of the express messenger, the servant of the defendants, and was so at the time of the loss.

5. The package was in the treasury box of the defendants during the transportation and at the time of the loss, and this treasure box was in the special charge of the express messenger.

6. No freight was paid the steam tug for the carriage of the treasure; no contract was made with the steam tug for its transportation; no notice of its existence on board was given to the officers or employés of the steam tug; its presence brought neither recompense nor responsibility to the steam tug.

7. Suppose, instead of travelling by the steam tug, the messenger had hired a row boat to put him on board the Senator, and the treasure had been lost from the row boat, would the owner of the boat have been the carrier, and the defendants mere forwarders?

8. The party who carries is, in the eye of the law, the party who has the profits of carrying. Of necessity, all others acting in the transportation must be agents of him who has the benefit. Shall a party have all the profits of an enterprise, and then evade all its responsibilities?

9. Who did undertake to carry this treasure? Some one did. Was it the defendants, who distinctly contracted *to forward and deliver it*, or was it the steam tug, whose officers and employés had no control over it, and did not even know of its existence on board? (*Stadhecker* v. *Combs*, 9 Richardson, 199, 200; *Reed* v. *Spaulding*, 5 Bosworth, 396; *Mercantile Ins. Co.* v. *Chase*, 1 E. D. Smith, 121; *Blossom* v. *Griffin*, 3 Kernan, 571; *Sweet* v. *Barney*, 24 Barb. 533.)

As to *technical forwarders*, their vocation, compensation, and liabilities, *vide* Angell on Carriers, Sec. 75.

Clearly, the business of defendants is not that of *technical forwarders*. Upon general principles, by numerous adjudications, by the judgment of this very Court, they are common carriers. Neither did they temporarily assume, or contract for a different character in this particular transaction. They received the bullion of plaintiff, and agreed to transport and deliver same, in the ordinary course of their business, and under their usual printed form of receipt. They agreed in the first part of that paper to assume all the duties of a common carrier as to the gold dust, "*to forward and deliver*" it; and here, the word forward is manifestly used in the sense of carry, or transport.

Upon the very threshold of their contract, therefore, they disclaim all character as *technical forwarders;* and yet, we are told, that in the latter part of the same contract, they declare themselves such. Why should the second use of the word *forward* (that is, *forwarders*) have a different meaning from that which it *must* bear when first used? If the verb *forward* is used to signify *to carry and transport as an express company*, why should not the noun, *forwarder*, in the same paper, be taken in the same sense; that is, *not to be responsible except as express carriers and transporters?*

Shall the word *forward* when first used, be taken according to its natural meaning, and then immediately thereafter *a technical* signification to be ascribed to the word *forwarders?*

Shall this be the construction, in view of the rule that words are to be taken in their plain and popular sense? (4 East. 135; 3 Kern. 574.)

By the Court, SAWYER, J.

This is an action to recover the sum of ten thousand seven hundred and fifty-five dollars, the value of a package of gold bullion delivered to defendants, at Los Angeles, to be transported to San Francisco, and which was lost in consequence of the explosion of the boiler of the steam tug, "Ada Hancock," while being transported in charge of defendants' mes-

senger from the shore, at San Pedro, to the anchorage of the steamer, "Senator."

The plaintiff, to maintain the action on his part, proved that "the defendants were, and are a company engaged in the public express business; that is to say, in receiving, forwarding, carrying and delivering, by sea or by land, for any one who employs them, treasure, goods and packages for hire from place to place within and without this State, in care of their own messengers, in vessels, and conveyances, and steamers, and boats, and vehicles, owned by others, and ordinarily used by the public at large, as the common and public mode of transportation and conveyance.

"That said defendants had an agency and an agent at Los Angeles for the purposes of their said public express business; their principal office and agency for the State of California being at San Francisco.

"That the usual modes of public conveyance and transportation between Los Angeles and San Francisco were, at the time hereinafter mentioned, and for a long time prior thereto, by a line of stage coaches the whole way, and also by stage coach from Los Angeles to San Pedro, and from San Pedro to San Francisco by a steamer called the 'Senator;' that an agent of the defendant always travelled on said steamer, 'Senator,' between San Francisco and San Pedro, who, on arriving at San Pedro, proceeded to Los Angeles by stage coach, and there received from the Los Angeles agent all express matter that had been left there to be forwarded, carried and delivered, returned with such express matter to San Pedro in time for the steamer, 'Senator's' return voyage, placed and shipped the express matter on board of such steamer, and returned on the steamer with the express matter in his charge to San Francisco, where it was in the first instance delivered at the general agency, and then delivered by such agency to the consignees or owners.

"That it was usual and customary for the steamer, 'Senator,' and all other coast steamers, on arriving at or approaching San Pedro, to anchor some three miles from shore, there not

being sufficient depth of water to enable such vessels to approach the shore. That the usual means and mode of transporting goods and passengers between the shore and steamer was by steam tug and lighters.

" That one of such usual and ordinary means was by a steam tug boat of about forty-two (42) tons burden, called, the 'Ada Hancock;' that is, it was usual and customary for the defendants' messenger to go from the shore to the steamer with the express treasure in charge on said tug boat, the heavier express freight being usually transported on lighters. That the express company was charged by the steamer the usual price for the passage of the express messenger and freight for all express goods, except treasure, which was carried in an iron box called the treasure-box, and was kept in the special charge of the messenger while on board the steamer, and no charge made by the steamer for its transportation.

" That as to any and all treasure transported by defendants upon said steam tug, 'Ada Hancock,' or upon said steamer, 'Senator,' no bill of lading was ever given, and no written contract of affreightment was ever made therefor, neither was any note or memorandum in writing of the true character or value thereof ever given by the defendants, or by their agents or servants, to the master, or officers, or agent, or owner of said steam tug, or said steamer, 'Senator.' That no freight was ever paid by or charged against defendants or their agents for treasure laden by them on board said steam tug to or from said steamer, 'Senator.' That the defendants used the usual means of public transportation in conducting their business, which was notorious, and known to the plaintiff at the time hereinafter stated.

" That on the 21st day of April, 1863, the plaintiff delivered at the City of Los Angeles, California, to the agent of the defendants at Los Angeles, a package of gold bullion of the value of ten thousand seven hundred and fifty-five dollars, ($10,755) to be transported to San Francisco in consideration of the sum of eighty dollars and sixty-five cents, then and there agreed to be paid to defendants by plaintiff, and on such deliv-

ery received and accepted from said agent a paper, partly printed and partly written, of which the following is a copy, the portion thereof italicised being written, and the portion thereof not italicised being printed, namely:

" 'WELLS, FARGO & CO.'S EXPRESS.

" 'Wells, Fargo & Co.,

" 'Express,

" 'Los Angeles.

" 'Value, $10,755.　　　　　　　　　　　April 21, 1863.

" 'Received of *George F. Hooper, dust and bullion.* Package, *value ten thousand seven hundred and fifty-five dollars.*

" 'Address, *Geo. F. Hooper,* which we agree to forward to *San Francisco,* and deliver to *address.*

" 'In no event to be liable beyond our route as herein receipted. It is further agreed, and is part of the consideration of this contract, that Wells, Fargo & Co. are not to be responsible except as forwarders, nor for any loss or damage arising from the dangers of railroad, ocean or river navigation, fire, etc., unless specially insured by them, and so specified on this receipt. For the proprietors,

" 'P. BANNING, Agent.

" 'Charges Col., $80 65.　　　　　　　　　Per Sanford.'

" Said package of gold bullion of the value of ten thousand seven hundred and fifty-five dollars has never been delivered by defendants to plaintiff, or to his address."

Defendants' agent, at Los Angeles, delivered said bullion to one Ritchie, the messenger, or traveling agent of defendants between Los Angeles and San Francisco, who took charge of the same and transported it to San Pedro by public stage coach. For the purpose of placing said bullion and other treasure on board the steamer, "Senator," which then lay at anchor, as usual, off the shore, for transportation to San Francisco, said Ritchie placed it on board the steam tug, "Ada Hancock," himself accompanying the bullion and having it in charge. Soon after, said steam tug having on board said bul-

lion, said Ritchie and several other passengers for San Fran-
cisco, started from the wharf for the purpose of placing said
passengers, bullion, etc., on board said steamer, " Senator."
Before reaching the anchorage of the " Senator," the boiler
of said steam tug exploded, whereby the said Ritchie and
several other passengers were killed, and said bullion lost.
There was evidence tending to prove, that the explosion was
caused by the carelessness of the engineer, and other officers
of the said steam tug. Defendants had no interest in said
steam tug, and no control over her management or naviga-
tion. The agents of defendants at Los Angeles had no author-
ity to insure said bullion. The plaintiff had no option as to
insuring, or not insuring the same with defendants at Los
Angeles. Insurance could only be effected thereon with said
defendants at their office in San Francisco.

The Court gave the jury the following instructions:

" First—That if defendant be an express company, pub-
licly engaged in transporting freight from one place to another,
for hire, they are common carriers, and subject to all the
responsibilities of common carriers, except so far as they have
modified them by agreement.

" Second—That the mere fact that an express company use
their own vessels and steamers, or the vessels or steamers of
others, in no way affects their liabilities as common carriers.

" Third—That if Wells, Fargo & Co. shipped the treasure
in question on board the steamer, 'Ada Hancock,' and there
was an explosion of said steamer, by which the treasure was
lost, and that explosion was occasioned by the negligence of
the parties in charge of the 'Ada Hancock,' then, Wells, Fargo
& Co. are liable for the value of said treasure.

" Fourth—An express company which is in the habit of
carrying, for hire, packages containing coin, dust and other
articles of value, from one place to another, is a common
carrier.

" Fifth—Express companies which carry packages over

routes where they employ other vehicles or means of conveyance than their own, are common carriers.

"Sixth—They may, however, by contract, limit their liability as common carriers, and if you find by the evidence that the defendants in this case did so limit their liability to the plaintiff, then the Court charges you that such limit of responsibility must govern; but that does not relieve defendants from ordinary care in the discharge of their duties.

"Seventh—The special agreement received in evidence cannot exempt defendants from accountability for losses occasioned by a defect in the vehicle or mode of conveyance used to effect the transportation.

"Eighth—If you find, from the evidence, that defendants undertook to forward the gold dust in question from Los Angeles, and deliver the same to plaintiff, at San Francisco, under a special agreement limiting the liability, defendants must be deemed to have undertaken the same degree of responsibility as that which attached to a private person, and were, therefore, bound to use ordinary care in the custody of the gold dust, and its delivery, and to provide proper means of conveyance for its transportation.

     &#42;     &#42;     &#42;     &#42;     &#42;     &#42;     &#42;     &#42;     &#42;

"Tenth—Should you find that the defendants shipped the treasure on board the steamer Ada Hancock, and there was an explosion of said steamer by which the treasure was lost, and that the explosion was occasioned by the negligence of the persons in charge of her, then defendants are liable for the value of the said treasure, by reason that they are responsible for injuries caused by the negligence of the agencies they employ in fulfilling the obligations of their undertaking."

The Court also refused the following instruction asked on the part of defendants, to which refusal defendants excepted:

"That if the defendants, by their agents, selected the steam tug Ada Hancock for transportation of the treasure from the wharf to the Senator, and the jury find that at the time of such selection and of placing the treasure on board, the said

4

tug was sufficient for the purpose of such contemplated transportation, then that the defendants are not responsible if the treasure was lost by any subsequent carelessness of the officers of the boat."

It is admitted by appellants' counsel that defendants, as to the transportation of said bullion, were acting in the capacity of common carriers; and such was undoubtedly their legal relation to said bullion at the time of its loss. It is further admitted—and this proposition also admits of little doubt— that defendants, under the law applicable to common carriers, are liable for its loss, unless such liability is restricted by the express stipulations of the contract between the parties for the conveyance of said bullion.

It is insisted, however, on the part of defendants, that the contract contains express stipulations which exonerate them from all liability for the loss under the circumstances disclosed by the record; while on the part of plaintiff, this proposition is controverted. If mistaken on this point, it is further claimed by the plaintiff, that any stipulation in a contract which purports to exonerate a common carrier from loss resulting from the carelessness, negligence or misfeasance of the carrier, or of his servants or agents, is contrary to the policy of the law and void. It is not pretended—and it could not with any show of reason be pretended—that the loss in question is within the meaning of the last clause of the receipt set out in the record relating to the dangers of navigation, etc. The clause relied on by defendants to relieve themselves from responsibility is as follows: "It is further agreed, and it is a part of the consideration of this contract, that Wells, Fargo & Co. are not to be responsible except as forwarders."

The liabilities of common carriers and forwarders, independent of any express stipulation in the contract, are entirely different. "The common carrier who undertakes to carry goods for hire, is bound to deliver them at all events, unless injured or destroyed by the act of God, or the king's enemies." (Edwards on Bail., 295.) "A common carrier is regarded by the law as an insurer of the property intrusted to him; or in

other words, he is legally responsible for acts against which he could not provide, from whatever cause arising, the acts of God and the public enemy only excepted." (Angel on Carriers, Sec. 67.) There are many accidents against which common carriers cannot protect themselves by the exercise of the utmost care and skill on the part of themselves and their employés, for the result of which they are nevertheless responsible. (Ed. on Bail., 454, *et seq.*, and Angel on Carriers, Chap. 11, and cases cited.) But the liability of "forwarders," is like that of warehousemen and common agents, and is governed by the general rule applicable to other bailees for hire not subject to extraordinary liabilities. They are responsible for ordinary care, skill and diligence—that is, such care and diligence as prudent men in similar circumstances usually exercise in the management of their own business. (Story on Bail., Sec. 444.) They are not, it is true, insurers like common carriers, but they are responsible for all injuries to property while in their charge resulting from negligence, or misfeasance of themselves, their agents or employés. In view of these principles governing the liabilities of "carriers" and "forwarders," what is the effect of the disputed clause in the contract under consideration upon the rights of the parties, plaintiff and defendants? What is the extent of the restriction upon the common law liabilities of the defendants? The language must be taken most strongly against the defendants. (Edwards on Bailments, 492.) The instrument is executed by them alone. It was drawn up with care, in language selected by themselves, the blank form having been printed in advance ready to be presented to all persons offering property for transportation by their express. The restrictions were for their benefit. The owners of packages sent by express rarely examine with care, or indeed have an opportunity to critically consider, the terms of the receipt presented to them; and general terms, under such circumstances, are apt to mislead. These are some of the reasons for the rule given in the books. In construing a covenant in a charter party, Mr. Justice Curtis said: "The rule of construction as to exceptions is, that

they are to be taken most strongly against the party for whose benefit they are introduced. * * * These words of exception being introduced by the covenanter for his own benefit, if they are capable of bearing a more or less extended meaning, the rule requires that meaning to be allowed to them which is least beneficial to the covenanter." (*Aiery* v. *Merrill*, 2 Curtis, 11.) And Mr. Chief Justice Gibson, in *Attwood* v. *Reliance Transportation Company*, 9 Watts, 88, in relation to a restriction in a contract by a carrier, said: "Though it is perhaps too late to say that a carrier may not accept his charge in special terms, it is not too late to say that the policy which dictated the rule of the common law requires that exceptions to it be strictly interpreted, and that it is his duty to bring his case strictly within them." And such is the well settled rule of construction in such cases.

The contract of defendants is not merely to forward the bullion, but to "forward to San Francisco *and deliver to address.*" They are not merely to start it upon the way by some suitable conveyance, but are to see that it reaches its destination, and are to "deliver to address." They were undoubtedly common carriers, and not forwarders in the technical sense of the term. But there was an evident intention on the part of defendants to restrict their liability, and, although they were acting in the capacity of carriers, they stipulated that they were "not to be responsible except as forwarders." As we construe this clause, it does not mean that defendants would start the package upon the way by some suitable conveyance, and that thereupon their responsibility should cease, for that would be directly in conflict with the covenant to "deliver to address." It simply means, that defendants would not assume the extraordinary responsibilities of a common carrier, and become an insurer of the goods, except as against loss resulting from the act of God or public enemies. There is no express covenant or exception against loss by negligence on the part of defendants, or of those employed by them in the transportation of their express matter. The exception fixes the limit of responsibility by referring to another class of bailees,

whose responsibilities are different from those of carriers; and the meaning, as we construe the restrictive clause, is, that they will be governed in respect to their liabilities by the same principles as those applicable to forwarders. It is manifest that it was not intended by this clause that all responsibility should cease as soon as the package was started upon its passage from the office of defendants at Los Angeles; for the receipt also contains the clause, " In no event to be liable beyond our route as herein receipted." The route as therein receipted extended to San Francisco. The printed form of the instrument used in this case was evidently framed with a view to general use, where the point of destination was beyond, as well as within the routes established and used by defendants. Evidently it was contemplated, that defendants might be liable for a loss occurring on their " route." If it was intended to release themselves from all responsibility while the package should be in transit, this clause would doubtless have been made to read, " In no event to be liable for any loss arising after leaving our office at Los Angeles," or some other language of equivalent import. The defendants were carriers, and the bullion was lost while in their possession in the character of carriers. It was not received to be stored, or to be started upon its passage merely, by the first convenient opportunity; but to be carried and delivered " to address," and for no other purpose. There was no point at which defendants were in fact mere forwarders, in the technical sense of the term, or in which they were warehousemen. The goods were never in their possession in such character, but in the character of carriers only. They could not be liable in a character which they never occupied; and their contract, that while they are carriers, they shall only be liable " as forwarders," in connection with the other language of the instrument, can only mean that the liability shall be governed by the principle of law applicable to forwarders; that is, that they shall only be liable for losses arising from a want of ordinary care on the part of themselves, and in the agencies made use of by them in the exercise of their ordinary business of carriers.

The word " as," is defined in the last edition of Webster's Dictionary as follows : " Like ; similar to ; of the same kind, or in the same manner ; in the manner in which." And this is obviously the ordinary import of the word standing in relations similar to that in the instrument under consideration. Defendant's liability was to be " similar to " that of forwarders—" of the same kind." They were to be liable " in the same manner"—" in the manner in which"—forwarders are liable. In what manner are forwarders responsible ? Of what kind is their liability? They are not insurers, like carriers, but they are liable for losses of goods while in their custody resulting from negligence of themselves and those whom they employ in their business of forwarders. And if a forwarder, or warehouseman, instead of using his own warehouse, and employing his own subordinates, should, for a stipulated sum paid to the owner, use in his business the warehouse of another person, who employs and controls the subordinates, there can be no doubt that he would be liable for a loss of the goods intrusted to his care occurring while in his possession, and resulting from the negligence of such subordinates, although not under his control. If the liability of these defendants under their contract is to be " similar to " that of forwarders—if it is of " the same kind"—if they are to be responsible " in the same manner," then they are liable for any loss resulting from the negligence of themselves, or negligence in the agencies employed by them, while the bullion was in their custody and control ; and that custody, without doubt, continued up to the moment of the loss, and would have continued but for the loss up to the time when it would have reached its destination, and been delivered " to address." The fact that defendants made use of various public conveyances, their messenger with the treasure travelling a part of the way by stage, a part by steam tug and lighters, and a part by ocean steamer, makes no difference as to their liability. For defendants' purposes the managers of those various conveyances were their agents and employés. Defendants had the means of holding the proprietors of those various vehicles used in their business

of expressmen responsible to them, had they chosen to do so.
If they did not take the proper means to secure themselves,
it was their own fault.   The defendants, although employing
public conveyances, were still carriers having the actual cus-
tody and management of the treasure during the transit, as
well as while it remained at the office of defendants at the
extremities of their route.   Ritchie, the messenger of the
defendants, was in the actual custody of the treasure during
the transit.   Suppose, by the carelessness of Ritchie in trans-
ferring the treasure from the steam tug to the " Senator," it
had been dropped into the ocean and lost, can it be pretended
that the defendants would have been exempt from liability
under the restrictive clause of their contract under considera-
tion ?   Would it be claimed, in such case that the liability of
defendants ceased as soon as the treasure left their office at Los
Angeles ?   We do not think any such construction would be
claimed for the stipulation.   If the defendants would not be
protected by the exception against loss from the negligence of
one of their servants, why should it protect them against the
negligence of another, who as to the same matter is in law
their servant or agent.   Both are, in contemplation of law, the
agents or employés of defendants, and the acts of both are the
acts of defendants, and the language of the restrictive clause
under consideration no more excludes the liability resulting
from the negligence of one than from that of the other.

The defendants were common carriers, but under the con-
tract they were carriers with limited responsibilities.   There
is an ample margin for the operation of the clause restrict-
ing the defendants' liability in the numerous accidents and
losses not arising out of negligence, or malfeasance, and not
even comprehended in the exception, " damages arising from
the dangers of railroad, ocean or river navigation, fire," etc.,
against which the carrier is an insurer, and from which for-
warders are exempt.

Much stronger language has been held not to exempt bailees
from losses arising from negligence.   To justify the conclu-
sion that such exemption is contemplated, the language should

be unequivocal, and susceptible of no other reasonable interpretation. In *Wells et al.* v. *Steam Navigation Company*, 8 N. Y. (4 Seld.) 375, the contract for towing a vessel from New York to Albany contained the clause " at the risk of the master and owners thereof." Although persons engaged in towing vessels have, in New York, been held not to be common carriers, the defendants in that case were still held to be liable for damages resulting from the carelessness of those engaged in towing the vessel, notwithstanding this restriction in their contract. Mr. Justice Mason said : " I cannot think the expression contained in it, ' at the risk of the master and owners thereof,' was understood by the parties as a protection against all kinds of negligence. It would be an extraordinary contract, which should in express terms give such a latitude in performing a kind of service of so important a character as the one under consideration; and to permit a contract to have so unreasonable an effect as it would imply, the intention of the parties should be clearly and unequivocally expressed, so as to leave no room for doubt or misconstruction. (6 John. 180 ; 7 Hill, 547.) In this contract nothing is said about negligence." (Page 379.) In the same case, Mr. Justice Gardiner, referring to *Alexander* v. *Greene*, 7 Hill, 544, said (page 382): " We held then if a party vested with a temporary control of another's property for a special purpose of this sort would shield himself from responsibility, on account of the gross negligence of himself and servants, he must show his immunity on the face of his agreement; and that a stipulation so extraordinary, so contrary to the general custom and the understanding of men of business, would not be implied from a general expression, to which effect might otherwise be given " —and that he saw no reason now for changing this rule. So, also, in *Schieffelin* v. *Harvey*, where goods shipped to England were "returned to the shippers at their own risk," and were purloined from the ship, the owner of the ship was held liable. The Court say : " It is undoubtedly true that the general operation of law may be controlled by the agreement of the parties. But such agreement ought to be clear and

capable of but one construction, unequivocally and necessarily evincing that such was the intention of both the parties." (6 John. 180.)  A similar rule is stated in *Buckman* v. *Shouse*, 5 Rawle, 189.  As further instances of the application of the rule to restrictive clauses in the contracts of carriers, see *Sager* v. *P. S. & P. E. R. R. Co.*, 31 Maine, 238, 239 ; *De Rothschild* v. *Royal Mail Steam Packet Co.*, 7 Exchequer R. 734.

So, also, in the case of the *New Jersey Steam Navigation Company* v. *Merchants' Bank*, in the Supreme Court of the United States, 6 How. 344.   The contract provided that : " The following conditions are stipulated and agreed to as part of this contract, to wit : The said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden ; and the New Jersey Steam Navigation Company will not, in any event, be responsible either to him or his employers, for the loss of any goods, wares, merchandise, money, notes, bills, evidences of debt, or property of any or every description, to be conveyed or transported by him in said crate or otherwise, in any manner, in the boats of the said company.   Further, that the said Harnden is to attach to his advertisements, to be inserted in the public prints, as a common carrier, exclusively responsible for his acts and doings, the following notice, which he is also to attach to his receipts or bills of lading, to be given in all cases for goods, wares and merchandise, and other property committed to his charge, to be transported in said crate or otherwise :

" 'Take Notice—William F. Harnden is alone responsible for the loss or injury of any articles or property committed to his care ; nor is any risk assumed by, nor can any be attached to the proprietors of the steamboats in which his crate may be and is transported, in respect to it or its contents, at any time.' "

Mr. Justice Nelson, in construing this contract says, (p. 383): " The language is general and broad, and might very well comprehend every description of risk incident to the shipment. But we think it would be going further than the intent of the parties, upon any fair and reasonable construction of the agree-

ment, were we to regard it as stipulating for wilful misconduct, gross negligence, or want of ordinary care, either in the seaworthiness of the vessel, her proper equipments and furniture, or in her management by the master and hands. * * * If it is competent at all for the carrier to stipulate for the gross negligence of himself, and his servants, or agents, in the transportation of the goods, it should be required to be done, at least, in terms that would leave no doubt as to the meaning of the parties."

To apply these principles to the case in hand, we think it cannot be said that the contract in question in clear and unequivocal terms necessarily evinces an intention on the part of both parties, or of either party, that defendants shall be exonerated from any loss resulting from negligence in the agencies employed by them in the transportation of treasure committed to their care. If such had been the intention, it certainly could, and doubtless would have been expressed in language about which there could be no misapprehension by either party. Nothing is said about negligence. The language used is not such as necessarily expresses, or as men would ordinarily employ to express the idea now claimed for it, and if so used, it would be likely to mislead a party to whom it is tendered ready executed upon the receipt of his property for transportation. That plaintiff could not have understood the contract in the sense claimed for it by the defendants, seems in the highest degree probable, for it can scarcely be credited, that a man of ordinary capacity and intelligence would commit so valuable a package to others to be transported a long distance, without supposing that somebody would be responsible to him for at least good faith, and ordinary care during the transit. But if the construction claimed for the stipulation in question is to prevail, the defendants were neither responsible themselves for ordinary care, after the treasure left their office at Los Angeles, nor bound to take the measures prescribed by the statute to make the owners of the vessels used by them as a means of transportation responsible.

The language of the stipulation under consideration, at least,

admits of the construction which we have given it; and to hold that the exception includes losses arising from negligence would, in our judgment, be to adopt a strained construction in favor of defendants, and to depart from its obvious import, while as we have seen the rule to be, the construction must be most strictly against the defendants.

Holding, as we do, that the exception in the contract, for the reasons stated, does not exempt the defendants from losses resulting from the negligence of those in charge of the steam tug, it becomes unnecessary to determine the more difficult question, in the present state of the authorities, as to the power of common carriers by special contract to exonerate themselves from liabilities arising from the negligence of those employed by them in their business of carriers.

The instructions of the Court, considered in connection with the instrument in evidence, are substantially in accordance with the views here expressed. We therefore find no error in them, or in refusing the instruction asked by defendants.

The damages alleged in the complaint are ten thousand seven hundred and fifty-five dollars, and judgment is asked for that amount only. The verdict and judgment are for eleven thousand seven hundred and forty-one dollars and eighty-seven cents. This exceeds the amount embraced within the issues. There is no provision in our Practice Act authorizing this Court to allow an amendment to the complaint making it correspond with the verdict. The Court below, before judgment, might have permitted an amendment so as to make the complaint correspond with the verdict, but this was not done. Upon consent of the respondent the judgment may be so modified as to reduce the recovery to the amount claimed in the complaint.

Ordered, that respondent have fifteen days within which to file his consent in writing, that the judgment be modified so as to reduce the amount to the sum of ten thousand seven hundred and fifty-five dollars, and upon filing such consent in writing, the judgment will be modified in pursuance thereof. In default of filing such written consent, it is ordered that

judgment be entered reversing the judgment of the District Court and granting a new trial.

It is further ordered, that appellants recover their costs of appeal.

SANDERSON, C. J., dissenting.

Upon the facts of this case, as detailed in the opinion of the Court delivered by Mr. Justice Sawyer, ·the Court below instructed the jury, in substance, that if the defendants were an express company, publicly engaged in the transportation of freight from one place to another for hire, they were in law common carriers, and subject to all the responsibilities of common carriers, except so far as they may have lawfully modified them by agreement, and that their responsibilities were wholly unaffected by the fact that they used other vehicles, vessels, or means of conveyance than their own, for the purposes of such transportation. That, as common carriers, the defendants could, by contract, limit the liability imposed upon them by the common law, to a certain extent; but they could not, by such contract, relieve themselves from the exercise of ordinary care in the discharge of their duties; and if the treasure was lost through their negligence, or the negligence of any of their agents, they were responsible for the loss, notwithstanding any contract to the contrary. That if the defendants shipped the treasure on board the Ada Hancock, and there was an explosion, occasioned by the negligence of the persons in charge of her, by which it was lost, they were liable, for the reason that by so shipping the treasure, they made, so far as the test of their liability to the plaintiff is concerned, the Ada Hancock their vessel, and the persons in charge of her their agents, for the purpose of fulfilling the obligations of their contract with him, notwithstanding they may have had no authority in the management or control of the vessel, or those in charge of her.

The Court below did not undertake to construe the contract in question, or to determine whether by its terms the defendants had stipulated for exemption from liability for any loss

which might result from the negligence of their agents, or any portion of them; but, assuming such to be the true meaning and intent of the contract, in effect charged the jury that the contract was void upon grounds of public policy so far as it attempted to protect the defendants against the negligence of their agents, whether such agents were in their immediate employment and directly under their supervision and absolute government, or were the parties in charge of the various public conveyances used by them in transporting the treasure in question, and not directly in their employment and in no respect under their control. Such is the theory upon which, as I understand the instructions, this case went to the jury.

The propositions contained in these instructions were duly excepted to by the defendants, and it is alleged that they are erroneous so far as they instruct the jury that the defendants could not, by contract, relieve themselves from liability for losses caused by the negligence of their agents, it being claimed that a common carrier may, by express agreement, circumscribe or limit his common law liability so as to protect himself from the consequences of any act of negligence or wrong committed by any person or persons other than himself, notwithstanding such persons may be his agents, or, in other words, he may by express contract nullify the common law doctrine of *respondeat superior;* and that this was done in the present case by the terms of the receipt which was given by the defendants and accepted by the plaintiff.

It is insisted on the part of the plaintiff that the receipt for the treasure and the annexed conditions given by the defendants, and accepted by the plaintiff, does not establish a contract between them restricting the common law liability of the defendants, because it does not appear to have been signed by the plaintiff, nor does it appear that he either read or was informed of its contents, or that he in any manner assented to its terms further than is implied by his acceptance and silence; and that, therefore, it, in contemplation of law, only amounts to a notice brought home to the plaintiff, to the effect that the defendants would not be responsible except as therein provided.

It is well settled that, if it is to be regarded as a notice merely, notwithstanding it was brought home to the knowledge of the plaintiff, it did not relieve the defendants from any responsibility imposed by the common law for a loss of the treasure occasioned by their negligence or the negligence of their agents. (*Sayer* v. *The Portsmouth S. and I. and E. Railroad Co.*, 31 Maine, 228; *Wild* v. *Pickford*, 8 Mees. and Welsh, 443; Story on Bailments, 4th edition, §571.)   But the weight of authority seems to be that a receipt delivered and received under like circumstances amounts to a contract.   A similar paper was so regarded in *Parsons* v. *Monteath*, 13 Barb. 353; *Moore* v. *Evans*, 14 Barb. 524, and in *Holford* v. *Adams*, 2 Duer, 480; and was expressly so decided in *Dorr* v. *N. J. Steam Navigation Co.*, 1 Kernan, 485, and in *Wells* v. *The New York Central R. R. Co.*, 24 N. Y. 183.   In the former case, the Court said: " The exception to the common law liability being made in the bill of lading and delivered to the agent of the plaintiff, must be deemed to have been agreed upon by the parties;" and in the latter : "The word 'agreed' means the concurrence of two parties, and the act of acceptance binds the acceptor as fully as his hand and seal would. (Co. Litt. §217, note; *5 Hill*, 258, 259; 1 Seld. 229; 27 Barb. 140, and cases cited.)   The point is too well settled to admit of debate."

It is also insisted on the part of the plaintiff that this contract when properly construed does not exempt the defendants from the liability sought to be enforced in this action.   The instrument was prepared by the defendants without previous consultation with the plaintiff, who had therefore no choice in the selection of the terms employed.   And it is well settled that the language creating the exceptions from liability in such cases must be strictly construed against the party in whose favor they are made.   The language was introduced by the defendants for their benefit, and if it is susceptible of a more or less extended meaning the rule of construction in such cases is to adopt that which is the least favorable to the party who is to be benefited thereby.   (*Munn* v. *Baker*, 3 Eng. Com.

Law, 339; *Airey* v. *Merrill*, 2 Curtis C. C. 8; *Atwood* v. *The Reliance Transportation Co.*, 9 Watts, 88; *De Rothschild* v. *Royal Mail Steam Packet Co.*, 7 Exchequer, Welsly, Hurl and Gord, 734.)

The language to be construed is as follows: " Received, etc., \* \* \* which we agree to forward \* \* \* and deliver. It is further agreed, *and is a part of the consideration of this contract*, that Wells, Fargo & Co. are not to be responsible, *except as forwarders*, nor for any loss or damage arising from the dangers of railroad, ocean, or river navigation, fire, etc., unless specially insured by them, and so specified in this receipt."

It is insisted by defendants that, notwithstanding they were common carriers and received full compensation for the transportation of the treasure in question, their liability touching such transportation is reduced from that of common carriers to that of forwarding merchants by the foregoing language, or in other words that their liability ceased when the treasure was placed on board the stage coach at Los Angeles, *en route* for San Francisco by coach, steam tug and steamer, the same being the usual mode of public transportation between those places; and that thereafter the treasure was at the risk of the plaintiff until it reached the general agency of the defendants at San Francisco, where their responsibility again attached and continued until a delivery thereof to the address of the plaintiff.

This contract must be read by the light of surrounding circumstances as disclosed by the evidence in the case. The defendants were engaged in the express business; that is to say, in receiving, carrying and delivering, by sea or by land, treasure, goods and packages for hire, in the care of their own messengers, but in vessels, conveyances, steamers, boats and vehicles belonging to other parties, in no way connected or associated with the defendants in their express business, and ordinarily used by the public at large as the common and public mode of transportation and conveyance. In these vessels, etc., the defendants had no interest and no voice in their management, nor

any authority or control whatever over the persons in charge of them, and were as powerless for the purpose of preventing negligence on their part as the plaintiff himself or any other stranger. But in their capacity as common carriers the defendants were liable for any loss resulting from a defective construction of these public conveyances or a careless and negligent management of them by persons in charge of them. All these facts and circumstances were notorious and well known to plaintiff, who had had previous dealings with the defendants in the line of their business. Viewed in the light of these circumstances it is obvious upon a mere glance at the contents of the instrument that it was designed to place a restriction upon the common law liability of the defendants. And I think this has been done in language which every business man would find no difficulty in understanding. They agree to transport the treasure to San Francisco and deliver it to the address of the plaintiff, who, on his part, agrees to pay them the sum of eighty dollars and sixty-five cents, and *in part consideration* relieve them from all liability for any loss or damage for which common carriers are, but mere forwarders of goods are not responsible. A forwarder is one whose business it is to receive and forward goods, by the usual modes of transportation, to their place of destination. He discharges himself from liability by showing that he has used ordinary diligence and prudence in forwarding the goods intrusted to his care by trustworthy and responsible parties engaged in the carrying business. His calling and the legal liabilities thereby imposed upon him are as well known among business men as that of common carriers and the liabilities imposed upon them by the law of the land. I find no difficulty in understanding the terms of this contract, and have no doubt that they were fully understood by the plaintiff at the time he accepted it without a word of dissent.

Having disposed of the preliminary points made by the plaintiff, we now come to the main question involved in this case, and which, so far as I am advised, is presented for the first time in this State. Counsel for the defendants affirm the

broad proposition that a common carrier may by contract with the shipper protect himself against all liability for losses occasioned by the negligence, fraud, or felony of his agents or servants. That the defendants are common carriers, and that their common law liabilities are wholly unaffected by the fact that they use means of conveyance not belonging to them or under their control or management, are propositions not denied by them. They fully concede that, aside from the contract they would, under the law and the facts of this case, be liable for the loss of the treasure in question; but they insist that *¹ꞏ y ꞏꞏe relieved from that liability by the express terms of the contract of shipment made with the plaintiff. On the part of the plaintiff it is contended that the contract in question is a contract by the defendants against actual negligence and fraud of themselves, their servants and agents, and therefore void upon grounds of public policy. Thus the question as to what extent a common carrier may, by express contract, restrict his common law liability, is clearly and fairly presented by the record. This question has been fully argued upon both sides with much learning and ability, and our task has been rendered comparatively easy by the industry and research of counsel.

That a common carrier may stipulate for exemption from liability for losses not resulting from any fault or negligence on his part, or on the part of his agents, notwithstanding much controversy heretofore, may now be regarded as well settled. By the common law he is absolutely liable for the safety of the goods intrusted to his care; and is responsible for injuries or losses arising from the acts of others, without any neglect or fault on his part, except such as arise from the "acts of God, the public enemies, or the fault of the party complaining." His liability is of two kinds: one is the liability of a paid bailee, and is for losses resulting from neglect on his part, or on the part of his agents; the other is that of an insurer, and is for losses resulting from accident or other unavoidable causes, without any fault on his part or on the part of his agents. Against this latter liability it is now well settled,

both in England and America, that he may protect himself by contract with the shipper of the goods; for no principle of public policy can be contravened by a contract which merely exempts him from liability for losses which have not been occasioned by any neglect or fault on his part, or on the part of those for whose acts the law holds him responsible. Whether he may go beyond this is a mooted question, for it is claimed by the defendants that there are cases both in England and America which seem to sustain, to its full extent, the doctrine for which they contend.

*Austin and another* v. *The Manchester, Sheffield, and Lincolnshire Railway Company*, 70 Eng. Com. Law R. 453, was an action to recover damages for the loss of a horse which was killed while being conveyed on defendants' railway. The horse was delivered to the railway company to be carried by them for hire subject to a note or ticket in the following words: " This ticket is issued subject to the owner's undertaking to bear all the risk of injury by conveyance and other contingencies; and the owner is required to see to the efficiency of the carriage before he allows his horses or live stock to be placed therein; the charge being for the use of the railway, carriage and locomotive power only, the company will not be responsible for any alleged defects in their carriages or trucks, unless complaint be made at the time of booking, or before the same leave the station; nor for any damages, however caused, to horses, cattle, or live stock of any description, travelling upon their railway or upon their vehicles." And it was held that, giving to the words of the contract their most limited meaning, they must apply to all risks, of whatever kind and however arising, to be encountered in the course of the journey; and that, therefore, the company were not responsible for the loss of the horse which was occasioned by the firing of a wheel in consequence of the neglect of the servants of the company to grease it.

*Carr* v. *The Lancashire and Yorkshire Railway Company*, 14 Eng. Law and Equity, 340, was a like case and founded upon a like contract, and it was held that, under the terms of

the contract, the railway company were not responsible.   In both of these cases the loss was occasioned by the gross negligence of the defendants, but it is to be observed that they were made to turn entirely upon the construction of the contracts upon which they were founded, and upon the assumption that the contracts were legal under the provisions of the Carriers' Act authorizing special contracts to be made; and it seems to have been admitted that railway companies had a right to protect themselves in such cases, doubtless, upon the principle that they were under no public obligation to transport cattle and live stock.   In the case last cited, Parke, B., said: "Prior to the establishment of railways, the Courts were in the habit of construing contracts between individuals and carriers much to the disadvantage of the latter.   Before railways were in use, the articles conveyed were of a different description from what they are now.   Sheep and other live animals are now carried upon railways, and horses which were used to draw vehicles are now themselves the objects of conveyance.   Contracts, therefore, are now made with reference to the new state of things, and it is very reasonable that carriers should be allowed to make agreements for the purpose of protecting themselves against the new risks to which they are in modern times exposed.   Horses are not conveyed on railways without much risk and danger; the rapid motion, the noise of the engine, and various other matters, are apt to alarm them and to cause them to do injury to themselves.   It is, therefore, very reasonable that carriers should protect themselves against loss by making special contracts."

Thus there are marked differences between those cases and the present, and the precise ground upon which this case rests was not considered or regarded as being involved, and hence the theory of the defendants finds in them but little, if any, support.   But there are several late cases decided by the Court of Appeals, of the State of New York, which seem to go a great way in sustaining the doctrine for which the defendants contend.

*Wells* v. *The New York Central Railroad Company*, 24 N.

Y. 181, was an action to recover damages for injuries sustained
by the plaintiff while a passenger upon defendants' road from
a collision between the train in which he was riding and a
freight train carelessly left on the track in the night time.
The plaintiff paid no fare, but was carried under a free ticket,
on which were printed the following words: "The person
accepting this free ticket assumes all the risk of accident, and
expressly agrees that the company shall not be liable under
any circumstances, whether of negligence of their agents or
otherwise, for any injury to the person, or for any loss or
injury to the property of the passenger using this ticket;"
and it was held that such contract was not against law or
public policy and was valid. That Court is composed of
eight Judges—a bare majority concurred in the judgment,
two dissented and one was absent. Mr. Justice Sutherland
delivered the dissenting opinion in which he held that the
contract exempting the defendants from liability for the negli-
gence of themselves and agents was null and void as being
against public policy. The leading opinion is very brief and
unsatisfactory, while the other is able and conclusive upon
the question as it was presented by the facts of that case.

This case was followed by *Perkins* v. the same company,
(24 N. Y. 196) where it was held that a railroad corporation
could not by contract exempt itself from liability to a passen-
ger for damages resulting from its own wilful misconduct,
but might, in respect to a gratuitous passenger, by contract
exempt itself from liability for any degree of negligence in its
servants, other than the board of directors or managers who
directly represent the corporation. Here a distinction was
made between passengers who pay and those who do not, and
between immediate and remote agents.

*Smith, Administrator of Joseph Ward, deceased* v. the same
company, 24 N. Y. 222, was an action under the statute for
damages resulting from the negligent killing of the plaintiff's
intestate while a passenger on the defendants' railroad. The
deceased made a written contract for the transportation of two
car loads of hogs. The contract recited that they were carried

at a reduced rate in consideration of the owner's assuming certain specified risks in respect to the safety of the hogs. It also contained this clause: "It is further agreed that the said Ward is to load, transship, and unload said stock at his own risk; the said New York Central Railroad Company furnishing the necessary laborers to assist. And it is further agreed that the persons riding free to take charge of the stock do so at their own risk of personal injury from whatever cause." Ward went upon the train in charge of his hogs. At Rochester the car in which Ward and other drovers had previously ridden was taken from the train, and an old emigrant car, unsafe by reason of a flattened wheel, was substituted. This car was thrown off the track, and Ward was killed. The plaintiff had a verdict. The judgment was affirmed by a majority of the Court, five being for affirmance and three for reversal. But the majority differ as to the grounds of affirmance. Mr. Justice Wright and Mr. Justice Sutherland held the contract void, the latter doing so irrespective of the question whether the transportation was gratuitous or for hire. Mr. Justice Smith was for affirmance on the ground that the negligence was that of the corporation itself, and not its agents. Mr. Justice Denio and Mr. Justice Davis were of the opinion that there is no general public policy forbidding a contract by which a railroad corporation may exempt itself from liability for the negligence of its agents in respect to a purely gratuitous passenger, but such contract was prohibited by the Railroad Act and its policy in the case of a paying passenger, and were for affirmance on the ground that the plaintiff's intestate was not a gratuitous passenger. So the case establishes no principle, and decides nothing except itself.

*Bissell* v. the same company, 25 N. Y. 442, was an action precisely like the last. The plaintiff had judgment, which was reversed on appeal, five Judges being for reversal and three for affirmance.

The most that can be said for these cases is that they establish the doctrine in New York that a railroad corporation may, by express contract, exempt itself from all liability for the

negligence or misconduct of its subordinate servants and agents, leaving, however, undetermined the question whether there are not certain agents so directly and immediately connected with the corporation that a contract relieving it from liability for their negligence would be illegal, (see opinion of Mr. Justice Selden in case last cited, p. 446,) which it must be confessed is not a very clear or satisfactory condition in which to leave so important a principle, and it admits of serious doubt whether, after all the discussion had in those cases, there is any common ground upon which a majority of the Court stand. Regarding them, however, as establishing the doctrine that a common carrier may contract against the negligence of his immediate agents, I think them opposed to principle and the weight of authority in America, and am not disposed to follow them. On the contrary, in my judgment, a contract exempting a common carrier from liability for losses to property, or injuries to persons resulting from the negligence of their agents, is null and void upon grounds of public policy, irrespective of the question whether the transportation be gratuitous or for hire. (See authorities cited in respondent's brief.) But in applying this principle a distinction is to be made between agents, as whether they are immediate or remote. By the former I mean such as are directly employed by the party sought to be charged, in his business exclusively, and are of his own selection, paid by him and in all respects subject to his will. By the latter I mean such as are made his agents (if I may be allowed the expression), not by contract directly between him and them, but by operation of law merely; or, in other words, persons not directly selected and employed by him and not in any respect under his control, but who nevertheless are in law considered as his agents, and for whose acts he is held responsible, notwithstanding they are in fact selected, employed and paid by and owe obedience to other parties who have no concern in his business and are in no just sense subordinate to him. Against the negligence of this latter class the common carrier may, in my judgment, protect himself by contrc    without violating any

principle of public policy, but as against the negligence of
the former he cannot. As to the former the carrier occupies
the position of a principal in fact as well as law, and the
true reason upon which the doctrine of *respondeat superior*
is founded exists; but his relation to the latter is not strictly
that of a principal, and the maxim, *Qui facit per aliam facit
per se*, does not apply in any just sense. On the contrary, as
to their acts he occupies a position *analogous to that of an
insurer only*, and there is therefore no rule of public policy
which precludes him from protecting himself by express con-
tract against the risk of their acts. It cannot be claimed with
any show of reason that negligence on the part of persons in
charge of public conveyances, such as railroad trains, steamers
and stage coaches, is induced by a contract between two
strangers to the effect that one will and the other will not
take upon himself the risk of their conduct in respect to the
transportation of a particular shipment of goods. The trans-
action is too remote and can possibly have no bearing or effect
upon the conduct of the parties in question. To say that the
persons in charge of the Ada Hancock were less careful in the
performance of their duty by reason of the contract between
the plaintiff and defendants, of which they knew nothing, is
to assert a proposition which is contrary to reason. Had the
treasure been lost through the negligence of Ritchie, the
defendants' messenger and immediate agent, or any other agent
directly employed by them in their express business, the
defendants would have been liable notwithstanding any con-
tract to the contrary, upon grounds of public policy. But
the defendants may lawfully contract (as I understand them to
have done, in effect, in the present case) for indemnity against
losses resulting from defects in the public conveyances used
by them in the prosecution of their business, and against the
negligence of the persons having such conveyances in charge,
without violating any principle of public policy. Such losses
are not the result of their fault or neglect within the true
intent and meaning of the rule invoked by the plaintiff.
The business in which the defendants are engaged, and the

mode in which it is transacted, are of comparatively modern growth, and had no existence at the time when the rule. in question became a part of the common law; and the new conditions presented by their use of remote, or, so to speak, foreign agencies in the transaction of their business, do not in my judgment fall within either the letter or spirit of that rule. The question is simply as to which of the contracting parties shall assume the risk of loss which may or may not result from the negligence of other parties over whom neither has any authority or control. In its determination the public can have no possible concern, for whichever way it may be decided the decision can have in the nature of things no effect whatever either by way of inducing or preventing the negligence in question. Nor is there any force in the suggestion that by holding such contracts valid the shipper will be placed at the mercy of the carrier. He is not bound to make the contract. On the contrary, he may insist that the carrier shall receive his goods upon the terms and conditions imposed by the law of the land, and the carrier cannot refuse to take them without subjecting himself to an action. Having engaged in a business, in its nature of a public character, he is bound to accommodate the public, and to receive and transport all goods coming within the line of his business, under all the responsibilities imposed by the law, upon the payment of a reasonable compensation.

It is urged, by way of argument on the part of the plaintiff, that, unless the defendants are held liable, the plaintiff will be without remedy, for the reason that the owners of the Ada Hancock, under the peculiar circumstances of this case, cannot be made responsible. This point rests upon the fact that the defendants did not give the master, agent or owners of the Ada Hancock a note in writing of the true character and value of the treasure in question, pursuant to the provisions of an Act of Congress of the 3d of March, 1851, entitled "An Act to limit the liability of shipowners, and for other purposes." (United States Statutes at Large, 635.) That Act, by its own terms (Section 7), does "not apply to the owner or owners

of any canal boat, barge or lighter, or to any vessel of any description whatever, used in rivers or inland navigation." It would seem that the Ada Hancock comes within the description of vessels excepted from the operation of the Act. She plies only between the shore and the anchorage of the steamer Senator, a distance of only three miles. Such can hardly be deemed ocean navigation. That term can only be applied to the voyage performed by the Senator. The ocean voyage commences and ends at the anchorage of the vessels by which it is performed. The office performed by the Ada Hancock was that of a lighter. She was used solely for the purpose of carrying passengers and light freight from the shore to the steamer Senator, and was, therefore, no more engaged in ocean navigation than the other small boats or vessels called lighters, in the record in this case, by which the heavier freight was usually transported. The latter are within the exact letter of the exception in question, and the Ada Hancock, in view of the purpose for which she was employed, can hardly be said to be without it merely because she is called a steam tug instead of a lighter. I am, therefore, of the opinion that the Act in question has no application to the facts of the present case; but were it otherwise, it is by no means clear that the defendants were guilty of negligence in not complying with its provisions in order to charge the owners of the Ada Hancock. The Act was intended solely for the benefit and protection of shipowners, and I see no reason why they may not waive its observance on the part of shippers, if so disposed. There are facts in this case which tend to show that such may have been the case in the present instance.

My conclusion is that the case was not tried in the Court below upon the proper theory, and that the judgment ought to be reversed and the case remanded.