SELIN (RHOADES v.). See Case No. 11,740.

SELKIRK, The (PROVOST v.). See Case No. 11,455.

SELLER (MERCHANTS' INS. CO. v.). See Case No. 9,444.

## Case No. 12,644.

### SELLER v. The PACIFIC.

[Deady, 17; [1] 1 Or. 409.]

District Court, D. Oregon. July 17, 1861.

CARRIERS OF GOODS—LIMITATION OF LIABILITY—EXPRESS AGREEMENT—NEGLIGENCE OF SERVANTS—"RECEIVED IN GOOD ORDER"—SUIT IN REM—BURDEN OF PROOF.

1. In a suit against a common carrier, the libellant makes a prima facie case by producing the receipt of the carrier—"Received in good order;" but these words do not constitute an agreement; they are a mere admission, and may be explained or contradicted by the carrier.

[Cited in The Live Yankee, Case No. 8,409; The Nith, 36 Fed. 87.]

2. In the national courts the rule is, that a common carrier may limit his liability by an express agreement—so far as the common law makes him an insurer—but not for the negligence of himself or servants.

3. Nothing short of an express stipulation will constitute such an agreement; it must not depend upon implication, or inference, or conflict-

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge; reprinted in 2 Ban. & A. 467; and here republished by permission. Merw. Pat. Inv. 271, contains only a partial report.]

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

ing or doubtful evidence; and mere notice to the shipper is not sufficient.

4. Where the drayman of the shipper, on the delivery of a package, takes a receipt from the freight clerk of the ship for the same, containing the words—"not accountable for contents," this of itself does not constitute such an agreement; it is a mere ex parte proposition on the part of the carrier after the receipt of the package, to which there must be direct and unequivocal evidence of the assent of the shipper to exonerate the carrier.

5. In a suit in rem, it is not necessary to charge the defendant as a common carrier, but the rule is otherwise where the suit is in personam; but in the former case it must appear from the evidence that the ship was employed in the business of a common carrier.

6. The burden of proof, to show the value of goods injured or not delivered, lies upon the shipper.

In admiralty.

George H. Williams and E. Nugent, for libellant.

Erasmus D. Shattuck, for claimant.

DEADY, District Judge. The libel in this cause was filed April 22, 1861, and alleges that on or about January 25, 1861, the steamship Pacific—being about to depart from the port of San Francisco on a voyage to the port of Portland—received from the libellant, Moses Seller, in good order, one case containing two looking-glasses, of the value of $450; and that the master of said ship, in consideration of certain freight and average to be paid by said libellant, agreed to convey said case and its contents to Portland, and there deliver the same to the libellant in good order. That the said master caused a receipt to be given to said libellant, whereby it was acknowledged that the said case and contents—marked "M. S., Portland, looking-glasses"—were received on board said ship "in good order." That the said ship shortly afterwards departed on said voyage, and that by the negligence of said master, the mariners and servants under his charge, said looking-glasses were so damaged as to be wholly lost to the libellant, to his damage $450. The answer of the claimant, Samuel J. Hensley, filed April 27, alleges substantially, that upon information and belief he denies all the allegations of the libel in the manner and form pleaded, but admits the receipt of the case; and avers that the contents of the case were in bad order at the time of delivery, and that the officers of the ship observed it and refused to give the drayman who delivered the case at the wharf a receipt as for goods in good order, but gave him one containing the words "not accountable for contents."

From the evidence it appears that a Mr. Adler, a short time before the sailing of the ship, purchased in San Francisco for the libellant two large fancy looking-glasses, about eight feet in length and three in width. That Adler sent the glasses to the house of R. A. Swain, a crockery and looking-glass dealer, to be packed for shipping,

where they were packed in a redwood case in good condition, and in a manner well calculated to resist the ordinary incidents of a voyage to Portland. That from the house of Swain they were taken with ordinary care on a spring-dray to the wharf where the ship was loading, and that then the case was taken from the dray by the drayman—Frederick Beeson—with the assistance of the freight clerk of the ship—Philips—and placed on the wharf alongside the ship. Philips then gave the drayman a receipt in these words: "Received from A. Frank, in good order, on board steamer Pacific, for Portland, the following packages, marked 'M. S., Portland,' one case of looking-glasses; not accountable for contents." The A. Frank spoken of in the receipt was the boss drayman, and Beeson was in his employ. At the time of giving the receipt, Philips said that he put the words "not accountable for contents" on it because the case contained looking-glasses, saying that was the customary way of receipting for such articles. The case was in good order at the time of the delivery, and also the contents, so far as either the drayman or clerk observed; and there does not appear to have been even a suspicion by them to the contrary. The case laid upon the wharf about twenty-four hours, when it was stowed between decks. On January 27, the ship sailed for Portland, where she arrived after an ordinary voyage on Sunday morning following. The case was discharged upon Couch & Flander's wharf, and upon turning it over, as it was being discharged, a rattling was heard inside, as of broken glass. On Monday morning Miller, the libellant's drayman, went to the wharf to get the case, and as soon as he got there he heard from some one that the glasses were broken. The case was standing on end at the time, and the wharfinger, Flanders, was delivering freight for Philips, who was temporarily absent. Miller looked at the case, and observed that on one side, about eighteen inches from the end, there appeared to have been a sharp instrument, or thing like a crow-bar, thrust through the boarding of the case, which splintered the board inwardly. Upon looking through the crack or hole in the board, he saw that the glass was broken—that the pieces were wedge-shaped—and that the cracks radiated from a common centre, as if the glass had been struck by some sharp-pointed instrument. Miller refused to receipt for the case in good order; whereupon Flanders proposed that it should be taken to the store of the libellant and examined in the presence of one of the ship's officers, and the damages ascertained. Thereupon the case was put upon the dray, when Poole, the purser of the ship, came up and said, that case should not go until the freight was paid. This was contrary to the usual custom of the ship with well known consignees in Portland, such as the libellant appears to

be. The result was that the case was taken by Miller, under the direction of Flanders, to the warehouse of the wharfinger, where it still remains. The board that had the hole made in it was brought into court and exhibited. It came into two parts on being taken from the case. It appears to have been broken by a blow from the outside, and upon either side of 'the opening is a bruise about two inches in length, as if made by some hard substance pressing between the edges, and stained with that dark iron color which iron imparts to fresh wood when pressed hard against it. The glass is between $\frac{1}{4}$ and $\frac{3}{16}$ of an inch thick. No fragments of the ornaments have been observed among the pieces of glass in the case, and there is no evidence that any of the inside fastenings used to secure and keep the glasses in position, have given way.

The only witness whose testimony differs from this statement of the facts is Burns, the first mate. He testifies that he was present when the case was brought to the wharf in San Francisco, and that he assisted to remove it from the dray. That he heard a rattling among the contents at the time, and that the clerk gave the receipt with the words—"not accountable for contents"—by his direction, because the contents appeared not to be in good order. That he superintended the stowing of the case, and that it was done carefully, but that every time it was moved on the voyage the contents rattled as if broken. Philips and Beeson directly contradicted Burns as to what took place upon the delivery of the case at the ship. Both were interrogated upon this point directly, and both say in unqualified terms, that he was not present, and that Philips gave the qualified receipt not on account of the condition of the package or its contents, but because of their kind and quality. The receipt supports the statement of the clerk and drayman, and directly contradicts that of Burns. It does not state that the goods are damaged, but the opposite—that they are in good order. Philips heard no rattling in the case until it was put on the wharf at Portland, when Burns called his attention to the fact. At the time of taking the case on board, Philips remembered that Burns called out to him and asked what was in it. Burns testifies that he then replied to Philips that there was something rattling in the case, but Philips testifies that he did not hear it. The case was a large one, and seems to have been the only one of the kind shipped on that voyage. It is hardly credible that if Burns had assisted in taking the case off the dray and observed the words "looking-glasses" on it, and heard a rattling as if the contents were broken or loose and on that account dictated an unusual receipt against the remonstrance of the drayman, that he would on the next day when superintending the stowing of the case, with the case before him, call out to the freight clerk on the wharf and ask him what was in it. The testimony of Burns must be disregarded as un-worthy of credit on account of its improbability, and because it is directly contradicted by that of Philips, Beeson and the receipt.

The receipt and non-delivery of the package being admitted, the rule of law is, that the libellant makes 'a prima facie case upon proving the receipt of the carrier containing the words—"received in good order." It has been contended that the claimant cannot contradict this admission, but the law is otherwise. The words "in good order" in a shipping receipt are, like the admission of any fact in any ordinary receipt for money, open to explanation or contradiction. They do not constitute an agreement, although they may be contained in one. But the burden of proof in this respect is upon the claimant; he must show the facts that the goods were not in good order, or he is bound by the admission in the receipt. This he has utterly failed to do, while on the contrary the libellant has satisfactorily shown, aliunde the receipt, that the package and contents were in good order when delivered to the ship. But it is maintained for the claimant that the words on the receipt—"not liable for contents"—constitute a special agreement by which the carrier is exempted from all liability as an insurer, and only required to exercise that ordinary diligence and care which the law exacts from any ordinary bailee for hire.

The question of how far a common carrier can limit his common law liability, by special agreement with the shipper, has been thoroughly and ably argued by counsel. The authority of the courts of New York has been relied on by counsel for the libellant, in support of the common law rule, that common carriers are insurers — that the law makes them so on grounds of public policy—and that any agreement which diminishes this liability is void as contrary to such policy, encouraging fraud and production of litigation. While I think that any innovation upon the common law rule on this subject, will always be the cause of more harm than good, yet this court is bound by the authority of New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344. In that case the supreme court held, that a common carrier might, by special agreement with the shipper, limit his liability as an insurer, but not for the negligence of himself or servants. The court also held that "the burden of proof lies on the carrier" to show such an agreement, and that nothing short of an express stipulation, by parol or writing, should be permitted to discharge him from the duties which the law annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful or conflicting evidence, but should be specific and certain, leaving no room for controversy between the parties.

Tried by this rule, do the words in the receipt, taken in connection with the circumstances, constitute such an agreement? If they do, then, although the case was in good order when delivered to the ship, the

burden of proof is upon the shipper to show that the injury resulted from the negligence of the carrier and not from unavoidable accident. Under such circumstances, the shipper takes all the risks except those which arise from or are incurred by the want of ordinary care and diligence on the part of the carrier. No mere notice to the shipper of intention on the part of the carrier to limit his liability is sufficient to constitute such an agreement, or raise the presumption that the shipper acquiesced in or consented to the terms of such notice. The obligation and liability of an insurer—acts of God and the public enemy only excepted—are imposed upon the common carrier by law, and cannot be avoided by any expression of intention on his part so to do, without the express assent of the shipper to such intention. As the court says in the case just quoted:—"If any implication is to be indulged in from the delivery of goods under the general notice"—that the carrier would not be responsible—"it is as strong that the owner intended to insist upon his rights, and the duties of the carrier, as it is that he assented to their qualification." See, also [New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344],[2] Hollister v. Nowlen, 19 Wend. 234. When Philips inserted in the receipt to the drayman the words, "not accountable for contents," the act amounted to nothing more than an ex parte proposition by the carrier after the receipt of the goods, and without the knowledge or assent of the shipper. The drayman Beeson was a mere bailee, for hire, to take the package to the wharf and deliver it to those in charge of the ship and take a receipt for it. Such employment of itself gave him no authority to make any contract for the shipper or give his assent to any proposition on the part of the carrier to limit his liability. Then, the evidence shows that the drayman informed the shipper of the terms of the receipt immediately, and because the latter did not reclaim the case, but allowed it to remain with the carrier, it is claimed that he assented to the proposition and is bound by it. But this would be to establish such an agreement "by implication and inference" when the "implication and inference" is just as strong that the shipper intended to insist upon his rights and the liability of the carrier.

Besides, the evidence also shows, that the shipper was not merely passive, but that he at once expressed his dissatisfaction to the drayman in strong terms, with the qualification in the receipt, and that the latter communicated this fact to the clerk soon after, and while the case was yet on the wharf.

As to the custom "not to sign for looking-glasses," unless the words "Not responsible for contents" were inserted in the receipt,

of which Philips testifies, as a matter-of-fact it appears to have depended, so far as it had any existence, upon the whim or caprice of the person receiving goods at the time. But if this were otherwise, it makes no difference. The law and not such a custom ascertains and limits the rights and liabilities of shippers and common carriers. Such pretences of custom as this appears to be, if allowed to be set up to control or modify the law on this subject would place it in the power of common carriers to make and unmake the law as they chose.

My conclusion is that the words in the receipt—"not accountable for contents"—were not assented to by the shipper, and therefore under the circumstances do not amount to an agreement to limit the common law liability of the carrier. This being so and it appearing that the articles were "received in good order" the burden of proof lies on the carrier to show that the injury resulted from either the act of God or the public enemy. Nothing of this kind is pretended. This view of the matter makes it unnecessary to determine, how, as a matter-of-fact, the glasses were broken. It is probable that either by accident or wantonly some iron instrument, as a crow-bar, was thrust through the board produced in court, and that it passed through the openings in the top-mounting of the frame of the glass next to that side of the case, without harming them, and then struck the plate of the other glass near to the base and broke it in fragments; and that this happened during the 24 hours that the case was lying on the ship's wharf at San Francisco. The glasses were packed in the case in a reversed position so that the lower end of each plate was over or under the scroll work which constituted the top of the frame of the other. The case has remained in the possession of the ship's agent, and if the claimant or he thought it would tend to establish the fact that the contents were not in good order when received, they might have had an examination made of the internal condition of the package.

Upon the argument, a point was made for the claimant that the libel did not charge that the ship was employed at the date of this voyage as a common carrier, and, therefore, it can only be held liable as a private carrier. Upon examination of the authorities and precedents within my reach, I find the practice to be, that when the suit is in personam, it is necessary to charge the defendant in the libel as a common carrier, or he will only be held to the liability of a private carrier. Story, Bailm. § 504. But when the suit, as in this instance, is in rem, the rule seems not to apply, because, as I suppose, it would, to say the least, be inaccurate to charge an inanimate thing, as a ship, which is only a means of transportation, as a common carrier. The suit proceeds against the ship as such, by reason of

the peculiar jurisdiction of the admiralty court; but to hold her to the responsibility of a common carrier, it must appear in the proof that she was so employed at the time. No testimony appears to have been directly taken for this purpose, but enough appears incidentally in the evidence to establish the fact beyond a doubt.

The only remaining question is the amount of the damages. Without determining at what port the value of the goods should be estimated, I have concluded to take the testimony of Leopold Greenbury on this point. He is the only witness who speaks of the value of the glasses who saw them. He was the salesman in the house where the glasses were packed. Selling looking-glasses is his business, and in the market where these were shipped. All the rest of the evidence upon this point is the mere guesswork of persons without any special knowledge of the trade or these particular articles. The burden of proof is on the libellant to show the value of the goods. The carrier is not presumed to have any special knowledge or means of information on this subject. The libellant knows at what price he purchased the glasses, and there is no difficulty in proving it. The testimony of Adler, the libellant's agent in purchasing the glasses, might have been taken on this point. The omission on the part of the libellant to do this is calculated to make the impression that such evidence would not support his claim for damages to the amount of $450. Greenbury swears that the glasses were worth $150 at wholesale and $200 at retail in San Francisco—owing somewhat to the customer. The mean between these two sums, with interest on that amount for six months at ten per centum per annum, gives $367 for both glasses.

Decree, that the libellant recover of the claimant and his sureties $367 and his costs.