MAY C. RUSSELL ET AL., DEFENDANTS IN ERROR, v. ERIE RAILROAD COMPANY, PLAINTIFF IN ERROR.

Argued March 16, 1904—Decided November 14, 1904.

1. It is lawful for a carrier to limit, by special contract, his common law liability, and he may thereby exempt himself from liability for any loss resulting otherwise than by the negligence or misfeasance of himself or his servants.

2. Where the owner of goods held in storage directed the storage company to send them to him by railroad, and an officer of the storage company sent the box containing the goods by a cartman to the railroad station, accompanied by a complete shipping order, the agent of the railroad company had no right to assume that the cartman had the authority to alter or modify the terms of the shipping order.

3. The presentation of the shipping order, signed by the storage company, was notice to the railroad company that the authority of the cartman was in no sense discretionary: it consisted only in delivering the goods and paying the freight, and there was no authority on his part to enter into a contract to exempt the railroad company from liability.

4. In order to constitute a ratification there must be acceptance of the results of the act with an intent to ratify and with full knowledge of all the material circumstances.

On error to the Supreme Court.

This action was brought by the plaintiffs to recover the value of a box containing goods owned by Mrs. Russell, which had been consigned from Buffalo, New York, to Rutherford, New Jersey, over the Erie railroad and lost in transit.

In June, 1902, Mrs. Russell caused the box in question, containing the goods belonging to her, to be stored with the Goldhagen Storage Company, in Buffalo. Mrs. Russell and her husband had packed the articles in the box; it was nailed up and marked "Last Box Packed." On the 19th of September, 1902, Mrs. Russell wrote to Mr. O. E. Goldhagen, of the Goldhagen Storage Company, saying: "Send a box marked 'Last Box Packed' to M. C. Russell, Rutherford, over Erie railroad. I would like them sent as soon as possible, and if you will kindly prepay charges I will refund check for same, together with storage rent." No other direction appears to have been given by Mrs. Russell. Mr. Goldhagen testified that on receipt of the letter he "made out the freight bill, marked the tag and nailed it on the box; sent for his cartman, instructed him to pay the freight and bring him a copy of the freight bill back." He made out a freight bill or shipping order upon one of the printed forms of the Erie Railroad Company, and in the proper place left thereon he wrote "Buffalo, N. Y., September 23d, 1902. Mrs. M. C. Russell, Rutherford, New Jersey, 1 Box." And he signed the shipping receipt "Goldhagen Storage Company." It appeared that Goldhagen wrote nothing else upon the printed form and delivered the same to one Weisser, together with the box, and gave him the directions above set forth. He gave the cartman no instructions as to the rate of freight he should pay. Weisser, after receiving the box with the above instructions from Goldhagen, turned it over to another cartman in the same employ by the name of Hoffmeister. He said that he was told to pay the freight and that no instructions of any kind were given to him. Hoffmeister took the box to the Erie railroad and there delivered it to the tallyman, who asked what the box contained, and on being told by Hoffmeister that it contained household goods, marked the letters "H. H." on the shipping order. Hoffmeister then presented the shipping order to one Fleming, the chief biller of the company, for the purpose of paying the freight. Fleming asked him what the box contained. On the carrier's replying

household goods, he added "gds" after the "H. H." on the shipping order, and then said there were two rates of freight —one a rate of thirty-nine cents valuation released to $5 a hundred in case of loss or damage; then there was a rate of fifty-eight and one-half cents a hundred valuation, not released. Fleming testified that Hoffmeister said he wanted the cheaper rate and that he figured it out at forty-seven cents, marked it on the shipping order and the original bill of lading. Hoffmeister's version was, "I told him to give me the cheaper rate, because if they wanted to pay the higher rate they would send it by express." Fleming wrote on the shipping order the words "Value relsd. to 5.00 per 100," and also wrote it on the bill of lading. He then made out a prepaid order for forty-seven cents and sent Hoffmeister to the cashier to pay that amount.

On the day following the bill of lading was brought back to Goldhagen; he folded it up and sent it by mail to Mrs. Russell, without noticing the words "Value relsd. to 5.00 per 100," written on it with lead pencil. On October 3d, on receipt of the way bill, the agent at Rutherford sent Mrs. Russell notice that her box had arrived. The next morning her husband directed a drayman to call for the box; when he called for it at the freight yard it was missing. On October 15th Mrs. Russell notified the company of the loss of the box. At the trial, counsel agreed that the value of the contents of the box was $300.

The case was tried at the Bergen Circuit, before Mr. Justice Pitney and a jury, and a verdict was rendered for the plaintiff for $363.55.

For the plaintiff in error, *Collins & Corbin*.

For the defendants in error, *Copeland, Luce & Kip*.

The opinion of the court was delivered by

VROOM, J. It was conceded at the trial that in the course of transit from Buffalo, New York, to Rutherford, in this

state, the property of the plaintiffs below was lost, and that the plaintiffs were entitled to a verdict for some amount by reason of that loss. The claim of the railroad company was that the trial judge should have charged the jury to find a verdict for the plaintiffs for $6.47, being the amount of the value of the shipment at the rate of $5 per one hundred pounds, plus the amount of freight—forty-seven cents. This request of defendant was declined and the case was left to the jury on the questions whether Mrs. Russell was charged with the terms of the returned bill of lading and the writing thereon, and whether the carter Hoffmeister had apparent authority to agree to a limitation of liability, and whether there was an agreement made to limit liability.

The first count in the declaration attributed negligence to the defendant's employes in the carriage and transportation of these goods, but the trial judge properly held that this was not sustained by the evidence and charged the jury that they could not find a verdict against the defendant on that ground.

That it is lawful for a carrier, by special contract, to limit his common law liability is admittedly the general rule in this country, and he may thereby exempt himself from liability for any loss resulting otherwise than by the negligence or misfeasance of himself or his servants. That a common carrier cannot by contract secure exemptions from liability for losses occasioned by its negligence, was held in Paul *v.* Pennsylvania Railroad Co., Supreme Court, February Term, 1904. Where there is no express contract limiting the liability of the carrier, he is bound, when goods are delivered to him for transportation, to deliver them unless prevented by the act of God or other cause which would excuse the carrier from the undertaking of insurance.

The question then arises whether there was any contract made in this case limiting the liability of the defendant, which is binding on the plaintiff, Mrs. Russell. The burden of proof of showing such a limitation of liability is on the defendant company, and being in derogation of common right,

is to be construed most strongly against the carrier.  5 *Am. & Eng. Encycl. L.* (2d ed.) 336; *Ashmore* v. *Pennsylvania Railroad Co.,* 4 *Dutcher* 180; *Hooper* v. *Wells, Fargo & Co.,* 27 *Cal.* 11.  No presumptions will be indulged in in favor of exemptions from common law liability.  While it is competent for a common carrier to provide by contract for such exemptions, it must be done in clear and unambiguous terms. *Edsall* v. *C. & A. R. R. Co.,* 50 *N. Y.* 661; *Babcock* v. *Lake Shore and M. S. Ry. Co.,* 49 *Id.* 491; *Aetna Insurance Co.* v. *Wheeler, Id.* 616; 6 *Encycl. L. & Pro.* 408.

It will be conceded that the only contract limiting the liability of the company was made with one Hoffmeister, a cartman, employed by the Goldhagen Storage Company to carry the box containing the goods to the railroad.  The instuction to have the goods shipped was from Mrs. Russell, and the directions in her letter to O. E. Goldhagen were simply to send a box, marked "Last Box Packed," to M. C. Russell, Rutherford, New Jersey, over the Erie railroad.  Mr. Goldhagen did not go personally with these goods, but delivered them with the two shipping orders, which he had filled out in his own hand, to a cartman, first to one Weisser, who turned the box and two papers over to another cartman named Hoffmeister.  The evidence is explicit that no instructions were given to the carter   save "take the goods," "pay the freight."  He was given the money to pay the freight and to bring back the bill.

It will not be disputed that the doctrine cited by the plaintiff in error is correct, that "a consignor, who sends goods to the depot of a carrier for shipment by an agent, impliedly authorizes such agent to make a special contract with the carrier as to the carriage of the goods, and the acceptance by such agent of a receipt or bill of lading containing limitation upon the liability of the carrier will bind his principal."  5 *Am. & Eng. Encycl. L.* (2d ed.) 305.

The law was clearly stated by the trial judge in his charge: "The ordinary rule is that a person, entrusted with goods to take to a freight office in order that they may be shipped by

the railroad, is presumed to have general authority to agree with the railroad company as to the terms of shipment; and that would include authority to make a reasonable agreement limiting the liability of the railroad company as an insurer, limiting it with respect to the valuation of the goods as far as the contract goes. So that, if Goldhagen, or the Goldhagen Storage Company, had gone with the goods, or if any person, lawfully authorized by the Goldhagen company had gone with the goods *without any limitation of his authority* appearing, in that event it would be presumed that he had a right to make the contract limiting the railroad company's liability."

Notwithstanding the fact that there were no other instructions given to the carter, Hoffmeister, than above mentioned, the railroad company contends that the cartman had authority to make, in behalf of the plaintiff, a contract limiting the common law liability of the defendant company. 6 *Encycl. L. & Pro.* 408, as follows, was cited in support of this contention: "One who has authority to ship goods for another has thereby implied authority to make a contract for their shipment, involving a limitation of the carrier's liability. Even though the delivery of the goods is by the cartman or teamster, if, by the usual course of business between the shipper and the carrier, it is customary for the cartman or teamster to accept the shipping contract, valid limitations therein limiting the carrier's liability will be binding on the shipper."

This is a broad statement and not borne out by the examination of the cases I have made; it will be noted, however, that nothing appeared in the testimony in this case showing the usual course of business between the shipper and the carrier, or that it was customary for the cartman or teamster to accept the shipping contract; but it does appear from the evidence that the cartman here had no express authority to agree to a limitation of liability.

An instructive case (*Nelson* v. *Hudson River Railroad Co.*, 48 *N. Y.* 498) from the Court of Appeals of New York was

cited by both the plaintiff and defendant in error; by the former, because it seemed to support the authority of the cartman to make a contract limiting liability; by the latter, because the enforcement of the liability was not put upon the ground that the cartman had authority to make the contract, but of what the court termed "a most complete and unequivocal ratification of the contract by the consignor." In the opinion in that case Judge Earl said (at p. 510) : "The cartman had no authority to make this contract. He was merely the servant of the consignors to deliver this box to the railroad and was clothed with no discretion to act for them. No authority could be implied from his character or business, and his principals were near at hand where they could act for themselves. But he assumed to act for them and to do what they were authorized to do. They were notified of all the facts and the contract made by him for them was delivered to them. They were informed if they had any objection to the contract made by their assumed agent, they should notify the defendant the next day. They made no objection and expressed no dissatisfaction with the contract, leaving the defendant's agent to suppose that it was satisfactory to them. It seems to me these facts constitute a most emphatic and unequivocal contract. A subsequent ratification, with knowledge of the facts—of the acts of the assumed agent— is equivalent to an original authority, and as this was a contract which the consignors would have deputed the cartman to make for them, it must be treated as made by them in person and binding on the plaintiff."

And in *Seller* v. *Steamship "Pacific,"* 1 *Oreg.* 409, it was held that where a drayman of the shipper, on the delivery to the carrier of a package, takes a receipt from the freight clerk of the ship, containing the words "not accountable for contents," this of itself does not constitute such an agreement; it is a mere *ex parte* proposition on the part of the carrier after the receipt of the package, and to exonerate the carrier there must be direct or unequivocal evidence of the assent of the shipper.

I am clearly of opinion that no authority was disclosed which would warrant the making of any contract by the cartman which would limit the liability of the railroad company as common carriers. When the Goldhagen Storage Company sent this box by the cartman to the railroad station, it was accompanied by a complete shipping order, and upon what principle can it be contended that the agent of the railroad company had the right to assume that the cartman had authority to alter or modify the terms of the shipping order? It seems to me that the duty of the agent plainly was to accept the goods on the terms stated in the order or refuse them, or he could, as actually was done here, take the risk of subsequently showing the authority of the cartman to change the terms of the contract. The railroad company was notified by the presentation of this shipping order, signed by the storage company, that the authority of the cartman was in no sense discretionary, that it was of the simplest kind, and consisted merely of delivering the goods and inquiring and paying the amount of freight, and there was no authority on his part to enter into any contract so important as the exemption of the railroad company from liability.

The charge of the trial judge on this point was not erroneous, although too favorable to the defendant.

If, however, the act of Hoffmeister was subsequently ratified by the Goldhagen Storage Company, or Mrs. Russell, it is binding upon Mrs. Russell, although Hoffmeister was not authorized to make this limitation and although he was not clothed with apparent authority. As was laid down in *Nelson* v. *Hudson River Railroad Co., supra,* "a subsequent ratification with knowledge of the facts of the acts of the assumed agent is equivalent to an original authority."

The contention of the plaintiff in error was that there was acceptance and ratification by Goldhagen, plaintiff's agent, of the offer of the carrier to reduce the freight rate in consideration of the limitation of liability authorized by Mrs. Russell. But there was no duty in the Goldhagen Storage Company, on the return of the carrier with the bill of lading,

to see whether the railroad company had accepted the goods on the terms stated in the shipping order; this, I think, was to be assumed in the absence of notice to the contrary. In the case of *Nelson* v. *Hudson River Railroad Co., supra,* notice was given to the consignors of the contract made for them by the cartman, and they were given until the next day to object to it. The intention of a carrier to limit his liability as insurer must be brought home to the shipper by a clear and unambiguous notice, and as stated by the Supreme Court of the United States, "the right of the carrier, then, to limit his liability in the shipment of goods has, we think, never been doubted. But admitting the right thus to restrict his obligation, it by no means follows that he can do it by any act of his own. He is in the exercise of a sort of public office and he has public duties to perform from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be supplied or inferred from a general notice to the public, limiting his obligation, which may or may not be assented to." *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 *How.* 382.

A ratification is defined to be the confirmation of a previous act done either by the party himself or by another; it is the confirmation of a voidable act. 23 *Am. & Eng. Encycl. L.* 889. And a confirmation necessarily supposes a knowledge of the thing ratified. *Blen* v. *Bear River, &c., Mining Co.,* 20 *Cal.* 613; *San Diego Railroad Co.* v. *Pacific Beach Co.,* 112 *Id.* 53. It follows, then, that in order to constitute a ratification there must be an acceptance of the results of the act with an intent to ratify and with full knowledge of all the material circumstances. *Ansonia* v. *Cooper,* 64 *Conn* 544.

The insistment of the railroad company is that even if the cartman had no lawful authority to make the agreement limiting the company's liability, yet the receipt of the bill of lading, as changed by Goldhagen without objection, was an acceptance of the company's proposition, and likewise the

receipt of the bill of lading by Mrs. Russell without objection was an acceptance by her of the contract therein expressed. In other words, both ratified the illegal contract made by the cartman. But if ratification necessarily supposes a knowledge of the thing ratified, and Mr. Goldhagen testified that he noticed no alteration in the bill of lading when he sent it to Mrs. Russell on its return to him by the cartman, and as no notice was given to him of the alteration, there could have been no ratification on his part. And Mrs. Russell certainly could not have been held to ratify it in the absence of any notice, and when she received the bill of lading not earlier than three days after the goods were shipped and too late to recall the box.

This question of ratification the trial judge left to the jury, and the following parts of his charge relate thereto: "Now, did Mr. Goldhagen see that (referring to the alterations by the company's agent in the bill of lading) and notice it? He testifies not. I don't know anything on which you have a right to believe that he did see it, and notice it as an alteration of the contract, and therefore the question is, was he negligent in not noticing it? Would a reasonably careful man in his situation have noticed it—noticed it, I mean, not as a mere scratch or word written upon the paper, but as an intended alteration of the contract that he had proposed to the company? That is the point."

"If Mr. Goldhagen did not notice it, then comes the question of what Mrs. Russell noticed. It was mailed—the paper was mailed, this bill of lading—by Goldhagen to Mrs. Russell and reached her presumably a day or two after the 24th day of September, two or three days after the shipment, as I understand the evidence."

"Well, the question of what he, as a reasonably prudent person, ought to do, is quite different, because, you see, she was not where she could easily communicate with the railroad, and not as well charged with the circumstances of the shipment as Mr. Goldhagen; but, at any rate, it is for you to

say whether, if she had been reasonably prudent, she would or would not have been charged with this notice."

Clearly, so far as the plaintiff in error is concerned, there was no error in this part of the charge; the only criticism to be made, if any, is that it is too favorable to the plaintiff in error.

The questions of the authority of the cartman to modify the terms of the contract, and of the notice to the consignor of such alteration, and of ratification, having been found by the jury in favor of the plaintiffs below, the added terms to the bill of lading, describing the contents of the box as "H. H. gds." and limiting the liability to $5 per one hundred pounds, become immaterial and need not be further considered.

I find no error, and the judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, GARRISON, FORT, SWAYZE, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY.  11.

*For reversal*—None.