BERWIND-WHITE COAL MINING CO. v. METROPOLITAN S. S. CO.

AMERICAN TRUST CO. v. SAME.

(Circuit Court, D. Maine. November 28, 1910.)

No. 625.

CARRIERS (§ 180*)—CARRIERS OF GOODS—CONNECTING CARRIERS—LIABILITY ON THROUGH BILL OF LADING.

Where a connecting carrier receives and forwards goods, which were shipped on a through bill of lading issued by the initial carrier, of which the connecting carrier is advised when it receives the goods, it takes them subject to the terms of such bill of lading; and where the original bill contains a provision for marine insurance on the shipment, the connecting carrier cannot limit its liability thereunder, as against the shipper, by the issuance of a supplemental bill of lading to the carrier from which it receives the goods, whatever its rights by subrogation may be against such carrier.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 180.*]

In Equity. Suits by the Berwind-White Coal Mining Company and the American Trust Company against the Metropolitan Steamship Company. On intervening petition of Brown & Adams. Decree for petitioners.

See, also, 183 Fed. 250.

Whipple, Sears & Ogden, for petitioners.

Coolidge & Hight and J. Markham Marshall, for receivers.

PUTNAM, Circuit Judge. This relates to several shipments of wool from Albuquerque, in the territory of New Mexico, to Boston, state of Massachusetts. All the shipments are the same in circumstances, the questions arising as to each are the same, and the judgment prayed for is a consolidated amount; so that we may speak of all the shipments in the singular, so far as it is convenient so to do. The wool was received in New Mexico by the Atchison. It was dedelivered en route by the Atchison to the Southern Pacific, and was delivered by the Southern Pacific en route to the receivers of the steamers of the Metropolitan Steamship Company, appointed by this court, to be transported by those steamers from New York to Boston. There was a total loss en route. There was no joint line and no joint undertaking by the three carriers named; but the Atchison gave a through bill of lading. That through bill of lading covered marine insurance, but fixed an agreed valuation on the shipments in case of loss. On receipt of the wool at New York, the receivers gave the Southern Pacific a supplemental bill of lading, which also covered marine insurance, but provided that the insurance should be adjusted according to the policies held by the receivers. There was a difference between the agreed valuation and the amount payable in the event of total loss by the policies last named, the excess being in favor of the shippers; and it is for that excess that the present intervening petition seeks to recover.

The case was argued before us; but we desired additional briefs which we have received and considered.

The bills of lading given by the receivers at New York contained a memorandum as follows:

"Insured Rate.

"Mdse. shipped under this bill of lading is covered by marine insurance while on board the steamers of the Metropolitan Steamship Co. in accordance with and subject to the conditions and limitations of policies held by them.

  \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Deliver to party surrendering bill of lading of initial line properly indorsed.                                    H. M. Whitney.

"Nov. 5, 1908."

Had this memorandum been called to our attention at the argument, we probably would not have asked for the supplemental briefs. It appears from this that the receivers were advised of the through bill of lading given by the Atchison from Albuquerque to Boston. The position of the various carriers was as follows: The Atchison transported the wool over its own line, and was responsible for its proper carriage to that extent. At the end of its line it stood in the position of a forwarder for subsequent transportation. Thereupon the Southern Pacific took it for carriage over its own line, and at the end of its line again took the place of a forwarder. The relative rights of the various carriers, and of the shippers to the various carriers, grew out of the different changes in the obligations of the first two carriers. It is entirely plain that, when the wool was delivered to the receivers, they were aware that the Southern Pacific stood as the forwarder, and they were informed that a bill of lading had been given covering the entire route. It followed, therefore, that they were

chargeable by the law with knowledge of the fact that, in forwarding the merchandise, neither the Atchison nor the Southern Pacific had any authority from the shippers to change the terms of the original bill of lading. It was therefore, in the eyes of the law, the duty of the receivers to ascertain the contents of the original bill of lading, so far as it concerned the through shipment, and they were charged with the knowledge thereof and the conditions which it imposed. This duty is a simple one, plainly resulting from the fundamental legal principles relating to the routing of the goods, and also as shown by the ordinary practice between carriers who merely connect, and the rules which have been worked out by a mass of decisions which we need not undertake to cite or explain. Therefore the result is that, in the eyes of the law, at the time the goods were delivered to the receivers, they knew the terms imposed by the original bill of lading on the two prior shippers, the Southern Pacific by succession to the Atchison; and they knew, consequently, as a matter of law, that the prior carriers were not authorized to forward the goods, except in accordance with the directions which each of them, one in succession to the other, had received. · Therefore the receivers knew as a matter of law that the Southern Pacific had no authority to vary the terms of shipment from those contained in the original bill of lading, whatever they were. If they did ascertain them, and were not satisfied to abide by them, they had a right to refuse the goods; but, no matter how much they might protest otherwise, the receipt of the goods bound them, of course, to the terms of the shipment. They could not receive the goods, making new terms therefor to suit their own convenience or customs. By the receipt of the goods, they were estopped in that direction as a matter of fundamental law. If they did not investigate the terms of the original bill of lading, they nevertheless, as we have shown, stand charged with the knowledge of its contents.

Whether or not, in view of the precise terms given by the receivers in their supplemental bill of lading, plainly in conflict with those contained in the original bill of lading, the Southern Pacific, by accepting the supplemental bill, bound itself primarily to make good to the shippers the excess we have named, and whether or not the receivers are under merely a secondary obligation which the Southern Pacific may be called on to make good to them, we are not required to determine, beyond the fact that the receivers should be subrogated to any claims which the shippers may have, or might have, against the Southern Pacific, which the judgment in this case must protect so far as it has any value, if it has any value. Aside from that, the situation is clear, and reducible to the plain terms of the case where the owners of certain merchandise in storage directed the warehouseman to forward the goods, without any authority on the part of the warehouseman to change the common-law terms of carriage. Russell v. Erie R. R., 70 N. J. Law, 808, 59 Atl. 150, 67 L. R. A. 433, decided November 15, 1901. In this case the carter of the warehousemen undertook to modify the terms of the shipping order from the owners of the merchandise; but the presentation of the shipping order was held to be a notice to the carrier that the carter had no authority with reference to

any modification. This was an ordinary, homely case; but it involved all the principles involved here, beyond the mere fact that the receivers did not in truth know the terms of the original bill of lading, a fact which we have shown to be unimportant, because they were chargeable with knowledge of it. Therefore there must be a decree for the petitioners, subject to any rights of subrogation which the receivers may have as explained herein. As the transaction arose entirely after the receivers were appointed, while the receivers were managing the steamers of the Metropolitan Steamship Company, the amount found due the intervening petitioners must be paid from the funds in the hands of the receivers, on the same footing as the ordinary charges and disbursements connected with the operation of the steamers; and the petitioners must receive the costs of this court to be paid in the same way.

The petitioners will file a draft decree in accordance with this opinion on or before the 3d day of December, 1910, and the receivers will file corrections thereof on or before the 7th day of December, 1910; all in a manner analogous to that directed by our rule 21.