CLARK & BOICE LUMBER CO. v. DUNCAN.

(Court of Civil Appeals of Texas. Texarkana. Jan. 4, 1912. On Motion for Rehearing, Feb. 15, 1912.)

1. VENDOR AND PURCHASER (§ 228*)—BONA FIDE PURCHASER—POWERS OF AGENT.

Where an agent under power of attorney conveyed land of his principal, taking in payment a conveyance of land to himself, a grantee of the agent who was aware of the breach of trust took no title.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 495–501; Dec. Dig. § 228.*]

2. PRINCIPAL AND AGENT (§ 166*)—POWER OF AGENT—RATIFICATION—EQUITABLE ESTOPPEL.

To be bound by a parol ratification of an agent's unauthorized transfer of land, the principal must have had full knowledge of all the material facts, and the principal's conduct must be such as to create an equitable estoppel.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 627–633; Dec. Dig. § 166.*]

3. PRINCIPAL AND AGENT (§ 194*)—RATIFICATION—INSTRUCTIONS.

In an action by a principal to set aside his agent's unauthorized transfer of land, ratification being set up, and it not appearing that the principal was in possession of all the facts, failure of the charge to direct that the knowledge of the principal is a prerequisite to ratification is reversible error.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 194.*]

4. PRINCIPAL AND AGENT (§ 173*)—RATIFICATION—EVIDENCE.

In an action by a principal to set aside his agent's unauthorized transfer of land, evidence held insufficient to establish a ratification.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 173.*]

5. PRINCIPAL AND AGENT (§ 161*)—ACTS OF AGENT—REPUDIATION BY PRINCIPAL.

Where an agent having a power of attorney to sell land, after making an unauthorized transfer, had a settlement with his principal and delivered to the principal notes and money due on former sales, the principal was not bound as a condition precedent to the re-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

pudiation of the unauthorized sale to return any proceeds of the sale.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 614–618; Dec. Dig. § 161.*]

Appeal from District Court, Cass County; P. A. Turner, Judge.

Action by the Clark & Boice Lumber Company against D. P. Duncan. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

O'Neal & Figures, for appellant. O'Neal & Allday, for appellee.

HODGES, J. Appellant brought this suit, in the form of an action of trespass to try title, against the appellee for the purpose of recovering 361¼ acres of land situated in Cass county. After a plea of not guilty, the defendant answered in substance as follows: (1) That he purchased the land sued for from the plaintiff through one H. M. Skelton, plaintiff's duly authorized agent, who was at the time empowered to sell and convey the same, and that he now holds the land by virtue of a conveyance from that agent made and delivered to him on the 15th day of August, 1906; that the consideration was $3,600 in cash paid to the agent, Skelton. It is also alleged that prior to the date above mentioned the defendant was the owner of a homestead consisting of 130 acres of land situated in Collin county, Tex., and that after some negotiations between defendant and Skelton the latter bought this tract of land, agreeing to pay therefor the sum of $6,500 in cash; that on the 18th day of the same month the defendant executed and delivered to Skelton a deed conveying to him the land in fee simple; that on the same day defendant purchased from Skelton, the agent of plaintiff, the land in controversy, agreeing to pay Skelton the sum of $3,600 in cash. The answer then proceeds as follows: "The result of said negotiations were that said Skelton on said day and date above mentioned did make, execute, and deliver to defendant, as attorney in fact for the plaintiff, a deed to said land in controversy herein, conveying the fee-simple title to the same, for which the defendant did pay said Skelton, agent as aforesaid, a cash consideration aforesaid; that is to say, that when the defendant herein executed to said Skelton said deed to his Collin county land, 130 acres, that the said H. M. Skelton then and there paid to the defendant the sum of $2,500 in cash, and retained $4,000 of said purchase money as attorney in fact of plaintiff—$3,600 for plaintiff—of which said H. M. Skelton, attorney in fact as aforesaid, then and there agreed to pay over to plaintiff, less 60 per cent. due to said H. M. Skelton, which under the contract he had a right to retain as his commission under his contract with plaintiff," etc. (2) It is further alleged that on November 9, 1906, Skelton, as agent of the plaintiff, had a settlement with it in which he accounted for and settled with plaintiff for the sale of the land in controversy, together with all other lands situated in Cass county which he had sold by virtue of his power of attorney; and for that reason defendant claims that plaintiff is now estopped to recover this land. (3) It is also alleged that with the full knowledge and consent of the plaintiff during the year 1905, and while purporting to act under his power of attorney, Skelton sold Cass county lands belonging to the plaintiff to other parties, and received as a part of the purchase price lands situated in Dallas county, Tex.; that those transactions were reported to and ratified by the plaintiff. It is averred that these facts constitute a further reason why plaintiff should now be estopped to claim the land. The answer then closes with the plea of improvements in good faith.

The appellant filed a supplemental petition, in which it denied any knowledge of the sale to appellee or that he had possession of the land, or claimed title to the same, till a few days prior to the filing of this suit. In a second supplemental petition appellant demurred generally to defendant's answer, and specially to that portion in which a ratification of the sale made by Skelton to defendant is set forth.

In submitting the case to the jury, the court gave the following charge: "If you believe from a preponderance of the evidence that on or about the 9th day of November, 1906, H. M. Skelton had a settlement with A. D. Clark, as the president and representative of the Clark & Boice Lumber Company, in which he charged himself with $1,800 in cash for the 360 acres of land sold by him to D. P. Duncan, and that he, Skelton, turned over to said Clark certain vendor's lien notes in payment of said $1,800, and that said Clark accepted said vendor's lien notes in satisfaction and payment of said $1,800, then you will find for defendant, D. P. Duncan. The burden is on the defendant, D. P. Duncan, to show his right to recover under this paragraph of the charge, by a preponderance of the evidence." A verdict was returned in favor of the defendant, and the plaintiff in the suit now appeals.

The errors assigned complain of the action of the court in overruling appellant's exceptions to the answer, the admission of testimony concerning the sale made by Skelton to other parties in 1905 in which the consideration was paid partly in land situated in Dallas county, and also complain of the insufficiency of the evidence to support the verdict of the jury.

[1] There was but little conflict in the testimony upon the issues which we think should control the disposition of this case.

It was shown that at the time and prior to the date of the principal transaction here involved appellant was the owner of a number of different tracts of land situated in Cass county which it desired to sell, and had entered into a contract with Skelton by which the latter was to act as its agent in selling the same, and for his services in that respect Skelton was to receive as compensation all over $4 per acre. Later this was changed to all over $5 per acre. Appellant also gave to Skelton the following power of attorney (omitting formal portions): "Now therefore said Clark & Boice Lumber Company, a private corporation, duly incorporated under and by virtue of the laws of the state of Texas, with its principal office in the city of Dallas, Dallas county, Texas, acting herein by and through M. S. Clark, its president, in consideration of the sum of one dollar to it in hand paid and by virtue of and in compliance with the above and foregoing resolution, do hereby make, constitute and appoint Henry M. Skelton its due and lawful agent and attorney in fact for it and in its name to sell the above and foregoing tracts of land and any parts or parcels thereof, and to execute warranty deeds therefor to the purchasers thereof in the name of said corporation. The price in no instance, however, to be less than four dollars per acre, and the terms to be at least one dollar per acre cash and the deferred payments to be at least as much as one dollar per acre per year with not less than eight per cent. interest evidenced by notes payable to the order of said corporation and secured by vendor's lien and also by deed of trust upon the lands conveyed with the usual terms, stipulations and provisions. Said Henry M. Skelton as agent and attorney in fact aforesaid is further authorized and empowered to receive and receipt for any and all cash payments and to receive and collect any and all notes given for said land authorized to be sold herein, and to execute releases and acquittances of all liens given to secure said notes." Previous to his dealings with the appellee, Skelton, according to his testimony, had sold several tracts of this Cass county land, and had settled with A. D. Clark as the representative of the appellant. He also testified that he learned through a son of the appellee that the latter desired to purchase land in Cass county, and would do so if he could dispose of his Collin county farm of 130 acres; that he, Skelton, thereupon had the Collin county land inspected, and concluded that it was worth the price asked for it, $50 per acre, and entered into negotiations with Duncan for its purchase and for the sale to Duncan of the land involved in this suit. Skelton and Duncan do not materially differ as to the details leading up to the consummation of the trade. These show without dispute that Duncan desired to sell his Collin county land and to purchase land in Cass coun-

ty. Skelton agreed to and did buy the Collin county land from Duncan, and paid for it with $2,500 in cash, which he raised on a note nominally made to Duncan, but taken up by another party, and by deeding to Duncan the land now sued for. The deed from Duncan to Skelton conveyed the Collin county land to the latter in his own proper person, while the deed from Skelton to Duncan purported to be a conveyance by Skelton as attorney in fact for the appellant. Duncan admits that he knew the land he was getting belonged to the appellant, and not to Skelton. While he pleads that Skelton agreed to account to appellant for the purchase price of the land less his commission, there is no evidence of such an agreement, or of any such an undertaking on the part of Skelton. The latter admits that at the time he was insolvent and had to borrow the money with which to make the cash payment of $2,500 to Duncan. This fact could not have escaped Duncan's notice. It is true Skelton says that he retained $4,000 as the purchase price of the land he sold on behalf of the appellant; but how could he retain that which he had never received and which he did not have? The legal effect of the transaction, when stripped of all disguise, is this: Skelton bought land for himself, and paid for it in part with land belonging to his principal. In the light of these facts, it would hardly be reasonable to insist that any title to the Cass county lands passed by the deed from Skelton to Duncan, nor does the appellee here make any such contention. The execution and delivery of the power of attorney to Skelton did not invest him with any character of title, or clothe him with any interest in the land, but was merely the creation of an agency, competent in law, to make conveyances of land in behalf of the owner. If the agent, having only such power, undertakes to transfer the title to the subject-matter of his agency in settlement of his own debt, or to exchange it for property which is designed by both parties to be appropriated to the agent's own use, his attempted transfer is a nullity in so far as it affects the title of his principal. Hunter v. Eastham, 95 Tex. 648, 69 S. W. 66; Dowden v. Gryer, 55 N. J. Law, 329, 26 Atl. 941; Campbell v. Campbell, 57 Wis. 288, 15 N. W. 138; Merchants' & Mfg. Bank v. Ohio Valley Furniture Co., 57 W. Va. 625, 50 S. E. 880, 70 L. R. A. 312. In the first case cited above an agent held a power of attorney authorizing him to sell and convey certain lands, and made a conveyance in consideration of the cancellation of his own personal obligation. The court said: "The agent, having no title of his own, could only pass that of his principal by the exercise of the power granted; that is, by selling the land, and executing a conveyance in effecting a sale. No power was given to convey without consideration, or upon a

consideration inuring to the agent, and the attempt of the agent to do this was by itself inoperative upon the title and passed nothing. [Citing authorities.] These authorities all hold that such a transaction does not pass the legal title out of the principal, but leaves it in him unaffected by the mere deed of the agent. It necessarily follows that one holding under such a transaction cannot rest upon the deed from the agent alone, since it has not divested the title out of the principal, but must bring to its support other facts establishing grounds for his protection in equity."

[2] If the deed from Skelton to Duncan was ineffectual for the purpose of passing title, the correctness of the judgment rendered in the court below must depend upon the existence of some grounds for an estoppel that may be claimed by Duncan. Judging from the charge given to the jury, the trial court took practically the same view; but in his instructions he assumed as a matter of law that if Skelton afterwards had a settlement with Clark as the agent of the appellant, in which Skelton charged himself with the amount of money that would be due the appellant as the purchase price of the land, and this sum was settled for in notes acceptable to Clark, without reference to Clark's knowledge of the transaction between Skelton and Duncan, this fact would be sufficient to defeat appellant's right to now recover its land. Where the agent in a case like the present has exceeded his authority, and a parol ratification is relied on to bind the principal, the facts constituting the ratification must be sufficient to create an equitable estoppel. Zimpleman v. Keating, 72 Tex. 318, 12 S. W. 177; Skirvin v. O'Brien, 43 Tex. Civ. App. 1, 95 S. W. 697. Such an estoppel "has its foundation in equity and good conscience. Its object is to prevent unconscientious and inequitable assertion or enforcement of claims or rights which have existed or been enforcible by other rules of law, unless prevented by the estoppel; and its practical effect is from motives of equity and fair dealing to create and vest opposing rights in the party who obtains the benefit of the estoppel. * * * It is accurate, therefore, to describe equitable estoppel in general terms as such conduct by a party that it would be fraudulent, or a fraud upon the rights of another, for him afterwards to repudiate and set up claims inconsistent with it." 2 Pomeroy, Eq. Jur. §§ 802, 803.

In order to bind the principal by an implied ratification of the unauthorized acts of his agent, it must be shown that the principal acted with full knowledge of all the material facts connected with the unauthorized transaction. Reese v. Medlock, 27 Tex. 123, 84 Am. Dec. 611; Russell v. Erie Ry. Co., 70 N. J. Law, 808, 59 Atl. 150, 67 L. R. A. 433; 1 Clark & Skyles on Agency, § 106, and authorities there cited. This is the general rule, and there is nothing in this case that would bring it within any of the exceptions. Equitable estoppels are permitted and enforced in particular cases solely with a view of dispensing justice, and to prevent the injustice which might result from a rigid adherence to the rules of the common law. Johnson v. Byler, 38 Tex. 606. Conceding the correctness of the proposition that if the principal, knowing all the facts, accepts and appropriates the proceeds of an unauthorized sale of his property, he is thereby estopped to thereafter assert his title against the purchaser, does it follow that the charge given in this case is correct, or that the verdict returned is supported by the facts?

[3] It requires but little examination of the evidence to answer the first inquiry in the negative; for if the testimony does not conclusively show that Clark, who acted as the representative of the appellant in the settlement referred to, accepted the notes transferred by Skelton in ignorance of the sale to Duncan, it at least made the existence of such knowledge an issue of fact to be determined by the jury. In ignoring that important essential in order to constitute that settlement an estoppel, the charge of the court was erroneous, and for that reason, if for no other, the judgment should be reversed.

[4] But an answer to the second question requires a more extended inquiry into the evidence. The principal witness upon whom the appellee relied to establish the facts constituting the estoppel pleaded was H. M. Skelton, the former agent of the appellant. It is impossible to read from the record before us the history of the transactions of this witness with Duncan, and the subsequent dealings between himself and Clark as detailed by Skelton, without observing his friendliness to the appellee and his efforts to protect his own conduct from the charge of infidelity to his principal. Whatever credit may have been given by the jury to the testimony of this witness inured to the advantage of Duncan, and the latter has no right to complain if we should take the version of the same witness in passing upon the sufficiency of the facts.

It appears from Skelton's testimony that by the terms of his contract with the appellant he was to receive, as his compensation for selling those Cass county lands, all over $4 per acre; that later, and prior to the date of the sale to Duncan, this portion of the contract was modified so that he was thereafter to get all over $5 per acre. It is conceded that the sum due appellant from the sale made to Duncan would amount to $1,800 in cash. Skelton also testified that, before dealing with Duncan, he had sold for appellant a number of other tracts of land, and had made with Clark, who was appellant's representative, two other settlements, in which he had paid over to Clark the money and notes due to the company as the

proceeds of the land sold. He says that in making those settlements he presented no detailed report of the particular tracts of land sold, or of the names of the parties to whom sales had been made, but simply reported sales aggregating money and notes amounting to a stated sum; that Clark could ascertain the tracts sold, and the names of the purchasers, by looking at the notes. The notes were all made payable to the Clark-Boice Lumber Company; and, after deducting what was due that company, Clark would indorse to him (Skelton) the notes remaining as that part of the proceeds due him as commissions for making the sales. Skelton also testified that at the conclusion of the second settlement he owed appellant $1,060, for which he gave his personal check on some bank, but that payment was refused on account of his having no funds there. He admitted that he still owed this sum when the final settlement was entered upon, but claims that it was also adjusted at that time. This sum added to the amount due from the sale to Duncan would make his indebtedness amount to $2,860 at the time he had this final settlement. But he admits that he then owed appellant still more. Skelton thus gives his version of the settlement in which he claims that the sum due from the sale to Duncan was adjusted and paid over to Clark: "That letter was handed to me in person. I did not sell any more land after that. On the 9th day of November, 1906, two months thereafter, we had a settlement. I represented to Mr. Clark, and told Mr. Clark that I had sold a sufficient acreage that would entitle him to receive $15,320 from the sales of all lands that I had sold; that I had paid to him in cash $1,695, that Mr. Clark had in his possession notes, first-lien notes, on lands that had been sold by me, aggregating $7,700; that I had in my possession notes, first-lien notes, on other acreage that had been sold, aggregating $12,060. I proposed to Mr. Clark that I had hypothecated this $12,060 with the Farm & Ranch Publishing Company to secure a debt for advertising this land. I stated to Mr. Clark that I would transfer to him $12,060 upon the delivery of $5,000 to release this collateral that they would place in his hands, together with the notes already in his possession, aggregating $2,300, and leaving a margin in his hands to secure him above $4,000 that he would be entitled to; or, if he would advance $2,500 for the release of the collateral, that portion of the collateral except the notes outstanding on the Lakeside farm, I would transfer that collateral to him and retain that series of notes on the Lakeside farm, which would give him a margin of $3,000 in secured notes above all the moneys that I owed him. Mr. Clark gave his check for $4,000, payable to the Farm & Ranch Publishing Company, and I caused to be delivered to him all of the collateral attached to that note, aggregating $12,060, and also turned over to him $3,445 worth of notes, with the understanding that all the collections of moneys on those notes should go to Mr. Clark until he should receive the amount that he was entitled to, $1,532, and the $4,000 that he had advanced upon this collateral, and the remainder of those notes was to be divided equally between Mr. Clark and myself; that is, on the collections of those notes—not the notes, but the collections. That was the trade that we made, and that was the trade that was closed up on the 9th day of November. That settlement was a final adjustment of the whole thing between me and Mr. Clark. Everything I had sold under that power of attorney was counted in in that matter. That included this sale to Duncan. Q. So, as I understand it, the notes you turned over to him as collateral, you paid him in full on the Duncan matter? A. Yes, sir. That included the sale to Duncan, and the sale to all other parties that I had made under that power of attorney—everything I owed him— all that debt."

At another stage in his examination he gives this further account of it: "I succeeded in making an arrangement with the Farm & Ranch to get a release of those securities that were pledged for a larger amount upon the payment of $4,000; and Mr. Clark agreed to advance the $4,000 and take over those securities. Those securities belonged to me, and were collateral to a note that I had with them. It was my own individual securities; had been transferred to me by the Clark & Boice Lumber Company. In this settlement I turned over to Mr. Clark $12,060 that was collateral to my note with the Farm & Ranch. That was my property, had been indorsed over to me by the Clark and Boice Lumber Company; proceeds of this land that I had sold; my part of those sales up to that time; and also $3,445 worth of notes. That $3,445 I had an interest in, and the $12,060 was my property. At the time of this settlement I owed the Clark & Boice Lumber Company $6,000. I owed them $4,000, and they advanced $6,000, or rather they advanced $4,000, which would then make me owe them $10,000; and for that $10,000 they got about $16,000 worth of securities. Those securities were noted, the proceeds of the sale of this Cass county land I had made under the power of attorney. Twelve thousand and sixty dollars of the notes had been indorsed over to me by the Clark & Boice Lumber Company. They knew what the paper was when they turned it over to me, for the paper showed on its face. That was a complete and final settlement of all sales of land in Cass county."

In addition to what this witness testifies to in the above extracts from the record, it must be taken as an undisputed fact that at the time this settlement was made Clark knew nothing of Skelton's dealings with

Duncan, and did not learn of them till a short time before the filing of this suit. We then have a sale of land made by an agent, bearing so prominently the earmarks of fraud upon the rights of the principal that suspicion of its unfairness can hardly be suppressed, followed by what is termed a settlement between the principal and its agent, in which the latter confessedly failed to disclose, if he did not intentionally conceal, the very transaction he now claims was affirmed. To hold that such a settlement made under such conditions constituted an equitable estoppel against the appellant's claiming its land after the fraud was discovered would be to disregard the most important elements upon which that invaluable rule of equity is founded. When it is further considered that in this alleged settlement the agent, according to his own admissions, was insolvent and owed his principal several thousand dollars which should have been paid in cash, and that instead of paying over that sum he forced the principal to take notes on third parties, most of which could not be collected, the injustice of such a contention becomes more apparent still.

If there ever existed any grounds upon which the appellant would be estopped by that settlement, it must have been because after discovering the truth it retained the notes turned over by Skelton in lieu of the cash due from him as the proceeds of the sale made to Duncan. The facts of this case do not present a situation where the rule requiring the principal to return the proceeds of an unauthorized sale as a condition of disaffirmance should be applied. The appellant had received nothing from Duncan, directly or indirectly; hence there was nothing that Duncan had a right to demand the return of before appellant could assert its right to the land he unlawfully held. With full knowledge of all the material facts, Duncan had conveyed his land to Skelton without even exacting any promise, or taking any precaution, concerning the payment of the purchase price to the true owner. Clark took from Skelton, if he took anything on account of this particular sale, notes secured by liens on other tracts of land, probably on those incumbered by other liens then held by appellant. Touching this feature of their negotiations, Duncan testified: "I know he (Skelton) placed a lien upon that Collin county land to get money; at least he told me he did. He did pay me $2,-500 in cash, according to our agreement. He retained $4,000 of that money. I don't know who he was to pay that money to. I presumed he would pay Clark and Boice their part of it, but, if he said so, I don't know it." Skelton says nothing about having made any agreement with Duncan to settle that debt. It thus appears that Duncan purchased without making any provisions for the

payment of the purchase money due the owner of the property. Whatever notes Clark received from Skelton were taken in settlement of an aggregate indebtedness amounting to several thousand dollars, with no apportionment of any particular notes to any special debt. It is not contended that collections of any consequence were made on those notes turned over to Clark; on the contrary, it is undisputed that most of them proved worthless except as a basis for foreclosing the liens upon the lands previously sold. Foreclosure suits were brought on nearly all of them, and appellant had to buy the land in to protect its interest. Under these conditions what was there that could be demanded in return as a condition precedent to the recovery of this land?

[5] The rule requiring the principal to return the proceeds of a sale as a condition upon which he may disaffirm unauthorized acts of his agent is applicable only when the principal is so situated that the retention of the proceeds can fairly be attributed to no other claim than as such proceeds. Smith v. Kidd, 68 N. Y. 130, 23 Am. Rep. 157; Gaskill v. Huffaker (Ky.) 49 S. W. 770; Swayne v. Insurance Co., 49 S. W. 518; 1 Clark & Skyles on Agency, § 140. If the agent owes the principal other debts for which such proceeds may legally be held, their retention will present no obstacle in the way of a disaffirmance, nor create an estoppel.

We not only think the court erred in giving the charge he did, but that he should have instructed a contrary verdict. The judgment is therefore reversed and here rendered for the appellant, together with all costs, both of this court and the court below.

### On Motion for Rehearing.

In view of the peculiar facts of this case, we have concluded to set aside our order rendering the judgment in this case, withdraw any reference to the sufficiency of the facts to constitute a basis for a claim of improvements in good faith, and to remand the cause for another trial; and it is so ordered.